**John L. JACKSON, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 6918.

District of Columbia Court of Appeals.

Argued Sept. 18, 1973.

Decided Dec. 19, 1974.

---

George P. Lamb, Jr., Washington, D. C., appointed by the court, for appellant.

Garey G. Stark, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and John S. Ransom, Asst. U. S. Attys., were on the brief, for appellee.

Before KELLY, FICKLING and KERN, Associate Judges.

KELLY, Associate Judge:

In this appeal from a conviction for first degree murder [1] appellant claims that any one of five errors committed at the trial level requires reversal. Specifically, appellant asserts that (1) the charges against him and a codefendant, Howard Schofield, were improperly joined in a single indictment; (2) the cases should have been severed at trial; (3) the prosecutor prejudicially frustrated his lawful pretrial discovery efforts; (4) the trial court admitted testimony of witnesses in violation of the *Bruton* [2] rule (5) the opening and closing statements of the prosecutor included improper and prejudicial remarks. We affirm.

I

At about 7:00 p. m. on October 17, 1971, John L. Jackson and his girl friend, Nynese Williams, drove to Twelfth and U Streets, N.W. Jackson parked near the corner of the intersection, got out of the car and, instructing Miss Williams to wait,

---

1. D.C.Code 1973, § 22–2401. Appellant was also convicted of carrying a pistol without a license, D.C.Code 1973, § 22–3204, but he does not appeal that conviction.

2. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

walked around the corner out of sight. Moments later he reappeared in the company of one Norman Pannell, who was carrying a stick. The two men stopped near the parked car and conversed for a few moments, with their voices growing progressively louder. Suddenly, Jackson drew a gun from his pocket and shot Pannell, then returned to the car and drove off, leaving Pannell dying on the sidewalk. Pannell died shortly after the police arrived. Although no gun was observed by the officers who examined the dying man lying on the sidewalk, a gun fell from the area of his waist as his body was being lifted onto a stretcher.

Some months later a grand jury returned a four count indictment in which it charged Jackson with first degree murder and carrying a pistol without a license and Howard Schofield, Jackson's friend, with being an accessory after the fact by threatening a material witness [3] and with obstructing justice by threatening and intimidating the same witness.[4] The jury convicted appellant on both counts with which he was charged. They acquitted his codefendant Schofield of the charge of obstructing justice.[5]

Miss Nynese Williams was the government's first witness. She testified that she was a drug user; that Jackson dealt in drugs, and that both she and Schofield had distributed drugs for Jackson. After an incident when Schofield was shot in the ankle, she said, Jackson and Schofield had each told her he believed Norman Pannell had been the assailant. Miss Williams testified that she had heard Jackson and Schofield discussing their desire to kill Pannell a number of times, primarily bickering over who would do it. More importantly, she testified concerning the actual slaying and its aftermath.

According to Miss Williams, just prior to the shooting she heard Pannell say, "I told you I didn't do it." Jackson thereupon drew his gun and Pannell took a step backward, dropping the stick he was carrying and placing his hands at his sides with the palms forward. Jackson fired once, then several times in succession. He then returned to the car and drove home. Schofield and his girl friend, Maggie Hawkins, were at the apartment when Jackson and Miss Williams arrived and Jackson told them "I downed the dude".[6] Later that evening Jackson told her that Pannell had it coming to him and asked her if she thought he was sadistic. He also said he had gone looking for Pannell. Miss Williams added that Jackson had told her not to talk about the murder and had threatened to kill her if she ever did so. When they later read the newspaper account of the murder Jackson told her he had not known Pannell was carrying a gun at the time.

Several months after the shooting Miss Williams was called to testify before a grand jury. The day following her last appearance Schofield called her and asked her to go for a ride. She declined and when Schofield came over to her house and repeated his entreaties, she again declined. Miss Williams called the police, believing the request was meant as a threat on her life. The officer to whom she spoke testified at trial, confirming that she had sounded frightened when she had called, and that he had sent a patrol car over to guard her home. In fact, he had gone over there himself to reassure her.

Two neighborhood residents who witnessed the shooting from nearby were also government witnesses. David Tyrone Edwards testified that Pannell had grabbed his stomach after Jackson fired the first

---

3. D.C.Code 1973, § 22–106.

4. D.C.Code 1973, § 22–703.

5. The court had previously granted Schofield's motion for judgment of acquittal on the charge of being an accessory after the fact to the murder.

6. Both Schofield and Hawkins, as well as Nynese Williams, were living in Jackson's apartment at the time.

shot. After the shooting, he said, he observed a revolver on the ground beside Pannell. The other witness, Milton Dorsey Washington, stated that Pannell went for his waist as if going for a gun just before being shot by Jackson.

Norman Pannell's widow, Valeria Pannell, testified that on a prior occasion she saw her husband shoot Schofield and had, in fact, tried to stop him. She said the shooting followed a discussion between her husband and Schofield during which her husband, a user of heroin and cocaine, accused Schofield of selling him bad drugs. She conceded that her husband had been a drug user and had dealt in drugs to obtain cocaine for himself. In response to a question concerning whether she knew Jackson she replied that she had never heard his name before her husband's death. She also testified that her husband always carried a gun in his belt.

At the close of the government's case, the court granted Schofield's motion for a judgment of acquittal with respect to the count of being an accessory after the fact, but denied the motion as to the charge of obstructing justice. Jackson then moved for mistrial and, when that motion was denied, renewed a motion for severance previously made both before and at the start of trial. He also moved for a judgment of acquittal. All motions were denied.

Jackson took the stand in his own behalf and denied using or dealing in drugs, or asking anyone to do so for him. He also denied that he discussed killing Pannell with Schofield at any time and claimed the shooting was in self-defense. According to Jackson's testimony, Pannell approached him carrying a stick and with something bulging from his waistband. When Pannell swore at him and raised the stick in an attempt to strike him, Jackson blocked it with his arm and the stick was dropped. Pannell then reached toward his waist as if going for a gun and Jackson, fearing for his life, drew his gun and fired.[7] Jackson added that he had been afraid of Pannell since the day after Schofield had been shot and he learned Pannell was after him as well. He also admitted telling Schofield that he had "downed the dude".

In an effort to discredit Miss Williams' testimony Jackson testified that she had lived with him for a time but had moved out after a fight in August of 1972. He also proffered, out of the presence of the jury, that if he testified Schofield would deny that he and Jackson had ever discussed killing Pannell before his death. Schofield declined to take the stand, however, unless his case was severed from that of Jackson. The trial judge refused to grant a severance and, as a consequence, Schofield did not testify.

II

■ Appellant claims that the joinder of defendants under Super.Ct.Cr.R. 8(b)[8] was initially improper because the charge that Schofield was an accessory after the fact to murder was included in the indictment as an artifice to obtain a joint trial. His argument is that the joinder was designed (1) to allow the government to introduce a broader range of otherwise inadmissible evidence at trial, (2) to preclude appellant from obtaining the testimony of his codefendant as a witness on his behalf, and (3) to prevent appellant from commenting on the character and activities of his codefendant. He also charges that the frivolous nature of that count was confirmed by

---

7. Charlie Duke, a man with whom Jackson had been talking prior to his encounter with Pannell, corroborated Jackson's version of the events.

8. Super.Ct.Cr.R. 8(b), which is identical to Fed.R.Crim.P. 8(b), provides:
   Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

its dismissal for want of evidence to support it at the close of the government's case.

The short answer to appellant's complaint is that joinder of defendants is proper under Rule 8(b) "if they are *alleged* to have participated in the same act or tranaction or in the same series of acts or transactions constituting an offense or offenses. . . ." [Emphasis supplied.] Count three of the indictment returned against Schofield alleged such participation. The fact that the count was subsequently dismissed for lack of evidence does not infect the joinder itself for it has been held that the allegation of participation in the indictment justifies the joinder. Schaffer v. United States, 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); *see also* 1 C. Wright, Federal Practice and Procedure: Criminal § 144, at 325 (1969). Moreover, while it rests upon inference, the evidence shows a sufficient nexus between Jackson and Schofield to support the inclusion in the indictment of a charge that Schofield assisted Jackson by threatening a material witness to the crime, albeit the trial court dismissed the charge at the close of the government's case. Accordingly, the initial joinder was proper.

### III

Many of appellant's arguments against joinder apply equally to his contention that the court erred in failing to grant his repeated motions for severance. Before trial, at its outset, and after the prosecution submitted its evidence, appellant moved that Schofield's case be severed from his own so that he might have the benefit of Schofield's testimony in defense. On the last occasion Jackson proffered to the court that Schofield would deny that he had plotted or discussed with Jackson the killing of Pannell thus refuting Miss Williams' testimony to the contrary. Schofield joined in the motion and counsel represented to the court that Schofield would testify on Jackson's behalf if, and only if, the cases were severed. Upon specific inquiry, Schofield assured the court that he would be willing to testify for the defense if his case were severed from that of his codefendant Jackson and that he understood the consequences and implications of his action. The motion for severance was denied.

Super.Ct.Cr.R. 14 provides that a judge may grant a severance of defendants "[i]f it appears that a defendant or the government is prejudiced by a joinder . . ."[9] The decision is discretionary with the trial court [10] and not subject to review except for abuse.[11] A finding of abuse of discretion requires a determination that a joint trial did in fact result in an appellant being denied a fair trial and due process of law. United States v. Shuford, 454 F.2d 772 (4th Cir. 1971); United States v. Kahn, 381 F.2d 824 (7th Cir.), cert. denied, 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967); United States v. Echeles, 352 F.2d 892 (7th Cir. 1965).

9. Super.Ct.Cr.R. 14, similar to Fed.R.Crim. P. 14, provides:
  If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the prosecutor to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

10. *See, e. g.,* Opper v. United States, 348 U. S. 84, 95, 75 S.Ct. 158, 99 L.Ed. 101 (1954); United States v. Miller, 145 U.S.App.D.C. 312, 319, 449 F.2d 974, 981 (1970); Hill v. United States, 135 U.S.App.D.C. 233, 234, 418 F.2d 449, 450 (1968); Brown v. United States, 126 U.S.App.D.C. 134, 139, 375 F.2d 310, 315 (1966), cert. denied, 388 U.S. 915, 87 S.Ct. 2133, 18 L.Ed.2d 1359 (1967).

11. United States v. Gambrill, 146 U.S.App. D.C. 72, 449 F.2d 1148 (1971). *See also* 1 C. Wright, *supra,* § 227, at 468–469.

The factors to be considered in ruling on a motion for severance are the exculpatory nature of the desired testimony, the desire of the movant to present this testimony, the willingness of the codefendant to testify, and the demands of effective judicial administration. Byrd v. Wainwright, 428 F.2d 1017, 1019–1020 (5th Cir. 1970). Since Schofield was not a witness to the shooting he could not have offered testimony exculpatory to the shooting itself.[12] At most he could have refuted Miss Williams' testimony that he had discussed killing Pannell with Jackson before Jackson actually shot Pannell, thereby offering testimony bearing on the issue of premeditation.[13] However, in view of Jackson's denial that such discussions had ever occurred and defense counsel's establishment on cross-examination that Miss Williams had twice attempted suicide, had been a drug addict, had lived with Schofield as well as appellant, albeit in a platonic relationship, and had lied to the grand jury on more than one occasion, we conclude the jury had clearly before it the issue of who was telling the truth concerning premeditation and a strong doubt cast on Miss Williams' credibility. Hence, we do not view the result as denying appellant a fundamentally fair trial. Therefore, the trial court did not commit reversible error in refusing to sever the trials of these two codefendants.

## IV

■ The allegation that the prosecutor prejudicially frustrated appellant's lawful discovery efforts by withholding evidence favorable to him is without merit. Before trial the prosecutor gave counsel the name and address of Charles McGill, one of two allegedly favorable witnesses to the defense, informing counsel that McGill had been interviewed by the police and had indicated "the matter was self-defense". The prosecutor refused, however, to turn over McGill's statement until the first day of trial. Neither counsel had been able to find McGill before trial, but during the trial the government did locate him and informed defense counsel of his whereabouts. A later interview outside the courtroom in which McGill denied making the statement convinced counsel that McGill was not a witness to be called in defense of his client. Another favorable witness, Milton Dorsey Washington, testified for the government and was cross-examined by the defense. Appellant never asserted that he was prejudiced by the failure of the prosecutor to provide him with the name of this witness earlier and while Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), would seem to require that the prosecutor provide the names of exculpatory witnesses upon request, under the circumstances here presented we see no prejudicial frustration of appellant's efforts at discovery.

## V

■ Appellant claims a violation of the rule established in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because two witnesses testified to statements allegedly made by Schofield out of appellant's presence which inculpated him with respect to premeditation and motive. The Supreme Court held in *Bruton* that the admission of statements allegedly made by a codefendant who does not testify and thus is not subject to cross-examination which tend to incriminate the other de-

12. It must be shown that the codefendant's testimony would be exculpatory. United States v. Echeles, *supra*; Smith v. United States, 385 F.2d 34, 38 (5th Cir. 1967). And, as the trial court noted in its memorandum order denying appellant's motion for new trial, appellant's own testimony almost completely corroborated the government's evidence when he took the stand.

13. The fact that Schofield's testimony would not in our judgment be critical to appellant's defense to the shooting distinguishes this case from United States v. Shuford, *supra*, and United States v. Echeles, *supra*, both heavily relied upon by appellant.

fendant violates the other defendant's Sixth Amendment right to cross-examination. In this case Nynese Williams testified about conversations between Schofield and Jackson which she had overheard and to conversations she had had with Jackson and Schofield individually. None of the statements attributed to Schofield in any manner incriminated Jackson, however, although some did tend to incriminate Schofield. In addition, her statements concerning what Jackson allegedly said to her do not fall within the *Bruton* rule since they were subject to full cross-examination. *Cf.* Nelson v. O'Neil, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971).

Valeria Pannell's testimony was likewise devoid of extrajudicial statements tending to incriminate the appellant. The pertinent portion of her testimony concerned a conversation between her husband and Schofield about narcotics which implied that Schofield was a dealer, but there was no suggestion made in the conversation that Jackson was involved. Accordingly, since the only statements incriminating to Jackson were made by persons testifying in court who were subject to full cross-examination, *cf.* Nelson v. O'Neil, *supra*, none of that testimony was within the category of hearsay condemned by *Bruton*.

### VI

Finally, appellant argues that certain remarks in the prosecutor's opening and closing statements to the jury were improper and prejudicial because they suggested that one motive for the shooting was a desire to eliminate a weak link in a drug distribution chain and allowed the admission of testimony concerning drugs that otherwise would have been inadmissible. The challenged remarks in the opening statement were that appellant was a drug dealer and that the decedent was one of his distributors;[14] in the closing argument the suggestion that appellant was exploiting his position at the Narcotics Treatment Administration to make contacts in furtherance of his illegal drug activities.[15]

Appellant moved for a mistrial at the conclusion of both the opening and closing statements and repeatedly objected to discussion of drugs and drug-related matters during the trial, citing their prejudicial and irrelevant character. The motions were denied and counsel were permitted to elicit from the witnesses testimony concerning drug use and distribution. The trial judge did, however, give the following instruction:

> Certain evidence was introduced in this case. It involved the alleged dealing and trafficking in narcotics. This evidence was admitted solely for your consideration of whether it tends to show that the defendants had a motive to commit the offenses with which they are now charged.

> In other words, there was evidence of other offenses not charged introduced for a very limited purpose.

---

14. Tr. at 5, Oct. 24, 1972, 10:00 a. m.:
   The Government's evidence will show that Mr. Schofield and Mr. Jackson were both employed by the Narcotics Treatment Administration of the District of Columbia, and while so employed the Government's evidence will show that they were dealing in cocaine, that one of the individuals who was a distributor was the deceased, Norman Pannell, that he did, in fact, receive cocaine which was bad, that he attempted to straighten this up, that he was unable to, that there came a time approximately a month or a month and a half before he was killed that he took a shot at Howard Schofield—shot Mr. Schofield in the ankle.

15. Tr. at S359-60, Oct. 31, 1972, 9:40 a. m.:
   . . . I'd suggest to you that that's your determination—then it is to be believed that John L. Jackson, who sits before you today as a former employee of the Narcotics Treatment Administration, was not only dealing with the Narcotics Treatment Administration, but was dealing in drugs in addition to that.
   What is a more perfect place to find an outlet for a source of drugs than the Narcotics Treatment Administration? Where do you have access to every junkie in town who is trying to do something about his problem? Where does anybody come who might need a pick-me-up, who might need a lift, who might need help? And where do they go; they go to this man, John L. Jackson, or they did.

You are not required to consider this evidence, and whether you do so or not is a matter within your exclusive province. You may not consider it as tending to show in any other respect the defendant's guilt of the offense with which he is charged.

In other words, the Government introduced that to show the possible motive for the conduct in question. [Tr. at S418–19, Oct. 31, 1972, 9:40 a. m.]

Appellant insists that Jackson's drug dealing, if true, relates to crimes not charged in the indictment and was of no probative value to the charge of first degree murder. He argues, in addition, that the allegations that Jackson exploited his position at the Narcotics Treatment Administration, that Pannell was one of his distributors, and that the motive for the slaying was the desire to eliminate a weak link in a drug distribution ring, were unsupported by the evidence. Appellant suggests that the cumulative effect of these remarks was to inflame the passions of the jurors, precluding an objective and dispassionate consideration of the evidence necessary for a fair trial.

"It is a principle of long standing in our law that evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged. . . ." Drew v. United States, 118 U.S.App.D.C. 11, 15, 331 F.2d 85, 89 (1964). [Footnote omitted; emphasis in original.] "Two well-established exceptions to the above general rule allow the introduction of evidence of an offense not charged where such evidence is relevant in establishing the motive or intent to commit the offense charged . . . or in explaining the circumstances of the offense charged . . . . Relevant evidence of an uncharged offense is admissible under these circumstances if its prejudicial effect is outweighed by its probative value . . . ." Wooten v. United States, D.C. App., 285 A.2d 308, 309 (1971). [Citations omitted.]

In this case the court permitted testimony concerning drugs because the government represented that it would prove that a motive for the shooting was a desire to eliminate a weak link in a drug distribution chain. On the same theory, the prosecutor was permitted to make remarks relating to drug use and dealing in both his opening and closing arguments as well as inquire of witnesses concerning these matters.[16] Defense counsel naturally responded to this line of inquiry by questioning witnesses on the same topic and making references to the drug-related evidence in his closing argument. Drew v. United States, *supra*; Wooten v. United States, *supra*.

Appellant is correct in his assertion that the evidence did not directly support the prosecutor's assertion that Pannell distributed for Jackson. The statement was made in his opening remarks and was not repeated in closing argument, however, and the trial judge carefully instructed the jury that the statements of counsel were not evidence and that their recollection of the evidence controlled. Therefore, we cannot say that in this context appellant was substantially prejudiced by this unproven allegation.

The challenged remarks in the prosecutor's closing argument are more troublesome. No evidence was introduced that Jackson was actually using his position as a counselor at the Narcotics Treatment Administration to make contacts. In view of Miss Williams' testimony that he and Schofield were dealing in drugs during this time interval, however, it would be reasonable to infer that Jackson made at least part of his sales to persons with

16. The testimony concerning drugs and drug distribution had a direct bearing on Schofield's being shot by Pannell and was also admissible on the question of Jackson's motive to avenge his friend's shooting.

whom he made contact through his job. While such a statement might in other circumstances prejudice a jury to such an extent as to outweigh any probative value it might have,[17] it is doubtful that the statements had such an impact in this case. Considerable evidence had already been introduced concerning the extensive drug dealings of Jackson and others, so it is unlikely that the jurors placed any particular emphasis on the challenged remarks. Appellant's counsel did not object to the remarks on the ground that they improperly suggested that his client was exploiting his position at the Narcotics Treatment Administration, but rather he repeated his general objection to any references to drugs and drug-related matters at the close of the government's argument. The court simply acknowledged his objection and it would appear that no one regarded the remarks as particularly significant at the time; they were just another reference to a topic which had been referred to as a possible motive for the shooting. Accordingly, we hold that the prosecutor's remarks did not constitute prejudicial error requiring reversal.

Affirmed.

17. *See* United States v. Whitmore, 156 U.S. App.D.C. 262, 480 F.2d 1154 (1973); United States v. Hawkins, 156 U.S.App.D.C. 259, 480 F.2d 1151 (1973); United States v. Phillips, 155 U.S.App.D.C. 93, 476 F.2d 538 (1973).