**William L. LUMPKIN, Appellant,**

v.

**UNITED STATES, Appellee.**

**Thomas A. FIELDS, Appellant,**

v.

**UNITED STATES, Appellee.**

**Herbert AUSTIN, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 88–536, 88–568 and 88–614.**

District of Columbia Court of Appeals.

Argued Nov. 28, 1990.
Decided Jan. 31, 1991.

Steven R. Kiersh, appointed by this court, with whom Karen L. Hochstein, Washington, D.C., was on the brief, for appellant Fields.

Elizabeth G. Taylor, with whom James Klein, and Henderson Hill, Public Defender Service, Washington, D.C., were on the brief, for appellant Austin.

Norman C. Bay, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Elizabeth Trosman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and TERRY, Associate Judges.

FERREN, Associate Judge:

Lumpkin, Austin, and Fields present an array of challenges to their convictions for conspiring and attempting to rob and kill fellow drug dealers who, in fact, were undercover police officers. There are three significant issues on appeal: whether the trial court (1) committed plain error in failing to give a special unanimity instruction as to the overt acts of the charged conspiracy; (2) committed plain error in twice ordering the jury to continue its deliberations, without giving a cautionary instruction to minimize juror coercion, after a poll each time revealed juror number one voted "not guilty"; and (3) erred in refusing to grant a severance so that one codefendant could testify on behalf of another without sacrificing the testifier's Fifth Amendment rights. Finding these contentions unconvincing, we affirm.

I.

During a drug sale a gunman, later identified as Lumpkin, attempted to rob, and shot, two "drug dealers" who actually were undercover Metropolitan Police officers, Gerald Awkard and Troy Pumphrey. The transaction began when two men, later identified as Fields and Austin, approached the officers' car at a prearranged meeting place. After discussing details of the sale, Fields and Austin left. Austin then called Pumphrey on a beeper, telling him to

David C. Gray, Portsmouth, N.H., appointed by this court, for appellant Lumpkin.

change the location of the buy because of Austin's perception that "police were all over the area." They agreed to meet at a local gas station. At the gas station, Lumpkin and Austin approached the car. The record is not clear as to Fields' whereabouts during the shooting.[1] After some discussion, Lumpkin shot the two officers, shot at the backup officers (Watkins and Hayes), and escaped. Austin was arrested at the scene; he confessed to being the lookout while Lumpkin robbed the officers. Later, Fields and Lumpkin turned themselves in.

Lumpkin, Austin, and Fields were convicted of conspiracy to commit robbery while armed, D.C.Code § 22–105a (1989). Fields also was convicted of two counts of unarmed assault with intent to commit robbery of Awkard and Pumphrey, *id.* § 22–501, and received a cumulative sentence of 11 years and 8 months to 35 years in prison. Austin also was convicted of two counts of assault with a dangerous weapon upon Awkard and Pumphrey, *id.* § 22–502, and assault upon Awkard and Pumphrey with intent to commit robbery while armed, *id.* §§ 22–501, –3202. He received a cumulative prison sentence of 21 years and 4 months to life. Lumpkin also was convicted of two counts of assault upon Awkard and Pumphrey with intent to commit robbery while armed, *id.*, one count of assault upon Pumphrey with intent to kill while armed, *id.* §§ 22–501, –3202, three counts of assault with a dangerous weapon upon Awkard, Watkins, and Hayes, *id.* § 22–502, and one count of carrying a pistol without a license, *id.* § 22–3204. He received cumulative sentences of 39 years and 4 months to life imprisonment.

## II.

■ Lumpkin claims plain error in the trial court's failure *sua sponte* to instruct that, in order to convict for conspiracy, the jury had to be unanimous on at least one overt act (rather than having some jurors agree on one act while the others agreed on another). *See Scarborough v. United States*, 522 A.2d 869, 872 (D.C.1987) (en banc). There was no such error. The sole object of the conspiracy, robbery of the undercover officers, had twenty-two alleged overt acts. Even without a special unanimity instruction the jury must have unanimously agreed on at least three of these acts, namely the three underlying offenses for which the jury unanimously convicted Lumpkin: unlawfully arming himself with a pistol, assaulting Pumphrey and Awkard with the intent to rob them while armed, and shooting at Awkard, Watkins, and Hayes to facilitate escape. See *supra* Part I. Each of these was an overt act sufficient to justify the conspiracy conviction. *See United States v. Castro*, 887 F.2d 988, 993–94 (9th Cir.1989). Accordingly, there was no risk that the jury was divided about the underlying acts necessary to justify that conviction. *Cf. United States v. Hubbard*, 281 U.S.App.D.C. 262, 264, 889 F.2d 277, 279–80 (1989) (no plain error when there was virtually no risk jury was divided over object of conspiracy, since appellant was convicted of one underlying substantive offense, and all but one of alleged overt acts fell within same conceptual group).

## III.

On two occasions the jury foreperson announced a unanimous verdict and the trial judge began to poll the jury. On each occasion, after all jurors announced "guilty" on the first (conspiracy) count, the judge polled as to the second count: assaulting Pumphrey with a dangerous weapon. Each time juror number one replied "not guilty." Each time the judge—without further comment—asked the jury to return for further deliberations.

Austin complains his verdict was tainted by the trial judge's failure to take precautionary action *sua sponte* before returning the jury to deliberate after the second

---

1. There was some testimony from which a juror could infer that Fields had driven the car that took Austin and Lumpkin to the gas station. Moreover, Fields' shirt was found near the shooting scene. There was, however, evidence that Austin used Fields' shirt under his own shirt to give the appearance he had PCP to sell.

poll [2]—for example, an inquiry to deal with possible juror confusion, or a cautionary instruction to prevent the dissenting juror from feeling coerced to give up her views. The government replies that, absent a request for such action, the trial court did not commit plain error (or, for that matter, any error at all).

## A.

 The purpose of the jury poll is to uncover doubt or confusion of individual jurors, *Johnson v. United States*, 360 A.2d 502, 505 (D.C.1976), to eliminate uncertainty concerning the verdict, *Arnold v. United States*, 511 A.2d 399, 417 (D.C.1986); *United States v. Mathis*, 175 U.S.App.D.C. 341, 345, 535 F.2d 1303, 1307 (1976), and to assure that no juror is coerced to join in a verdict with which the juror does not agree. *Arnold*, 511 A.2d at 417. The trial court has substantial discretion to decide how to poll the jury, *United States v. Mangieri*, 224 U.S.App.D.C. 295, 307, 694 F.2d 1270, 1282 (1982), and once a poll has shown a lack of unanimity the trial court may either order further deliberations or declare a mistrial on the counts reflecting disagreement. *Kendall v. United States*, 349 A.2d 464, 467 (D.C.1975). *See* Super. Ct.Crim.R. 31(d).

 In arguing their respective positions, appellant relies primarily on *Crowder v. United States*, 383 A.2d 336, 341–43 (D.C.1978), while the government stresses *Artis v. United States*, 505 A.2d 52, 58 (D.C.), *cert. denied*, 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986). In *Crowder*, a juror was obviously the lone dissenter because that juror was the twelfth one polled

after all other jurors had announced "guilty." In that context, we reversed for abuse of discretion in not discharging the jury and declaring a mistrial. We concluded that the lone juror might reasonably have interpreted the trial court's direction, returning the jury to deliberate, as a message to change the juror's vote—especially because that juror had expressed her lone dissent for "lack of evidence," not out of apparent confusion. *Crowder*, 383 A.2d at 342.

By contrast, in *Artis* the trial court cut short the jury poll on count four when juror number one said the defendant was "not guilty" (although the court continued to take unanimous verdicts on the other counts). *Artis*, 505 A.2d at 57. There was no indication about the votes of the other eleven jurors on count four. We accordingly ruled that the court had not committed plain error in failing to give a cautionary instruction (which had not been requested) when the trial court ordered further deliberation on count four. We said that the juror who had voted "not guilty" during the poll was not likely to have felt coerced because that juror had not been "isolated as a sole dissenter." *Id.* at 58. We also noted that other jurors were not likely to have felt coerced "because the numerical split of the jury on count four was not revealed in open court." *Id.; see Crowder*, 383 A.2d at 343 n. 14.

We agree with the government that *Artis* governs here. We note, first, that Austin did not request at trial the kind of inquiry or cautionary instruction he now insists the court should have initiated; thus, as in *Artis*, we review for plain error. *See Artis*, 505 A.2d at 58.[3] We find none.

**2.** Counsel for Austin acknowledged at oral argument that the trial court did not err in sending the jury back to deliberate without a cautionary instruction after the first poll. *See Artis v. United States*, 505 A.2d 52, 58 (D.C.), *cert. denied*, 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986).

**3.** Austin suggests that this is not a plain error case. Relying on *Kendall v. United States*, 349 A.2d 464, 467 (D.C.1975), he argues that once the defense requests a jury poll the trial court is, in effect, on notice of juror dissent and thus that further defense objection would be "redundant."

*Id. Kendall*, however, arose in different circumstances. There the government argued that because appellant's counsel did not object, he was effectively "precluded from contesting" on appeal the trial court's continuing the poll after a juror noted a dissent. *See id.* In response to this waiver argument, we said that requiring further objection would be redundant and, therefore, that appellant did not lose his right to present the issue on appeal. The issue addressed in *Kendall* is no longer in dispute; this court has held that, even if counsel fails to object at trial, appellant may still raise the issue on appeal, albeit under a "plain error" standard

On each occasion, the trial court immediately discontinued the poll and ordered further deliberations when juror number one responded "not guilty." At no point did the trial court know whether juror number one was a lone dissenter, for the other eleven jurors were never polled. Furthermore, because the numerical split of the jurors was not revealed in open court, other jurors may have been more willing to consider the dissenter's concerns during renewed deliberations than they would have been "if they had already given a contrary opinion in open court, when polled." *Crowder*, 383 A.2d at 343 n. 14. Under these circumstances, it is unlikely that the judge's action intimidated juror number one or any other juror.

### B.

Austin further contends, however, that such a simple application of *Artis* misses the point. He emphasizes that the first juror must have felt isolated after the second poll, if not after the first, because by that time "juror number one at least must have perceived himself to be the lone dissenter." That observation, however, does not carry Austin's argument far enough. The concern is not that a juror may recognize he or she is the lone dissenter; that is often the case in the jury room. The concern, rather, is that the juror will believe the judge knows he or she is the lone dissenter, and thus will believe the judge has ordered further deliberations to coerce a change of mind. *See Artis*, 505 A.2d at 58. On this record, this concern is substantially overstated.

After the second attempted poll the judge could not have known, any more than after the first poll, that juror number one was a lone dissenter; nothing more was revealed the second time.

When the "not guilty" incident occurred a second time, the judge may have begun to suspect that the first juror was a lone dissenter. But this repeated sequence did not necessarily isolate that juror in the judge's eyes; the judge would still have had to speculate that no more than one juror in a case of many counts and lesser included offenses was likely to have last-minute misgivings.[4] Because the judge could not have known the vote—any more than he could have known it after the first poll—we are not persuaded, absent objection by counsel at the time, that a reasonable juror would have believed the judge was trying to coerce a result by a second use of the same simple procedure. Jurors know the verdict must be unanimous. The judge's approach reflected a neutral recognition of an obvious inconsistency between the foreperson's announcement and the juror's response. We believe a reasonable juror, therefore, would have recognized that this approach was merely a proper insistence on a unanimous verdict, not an improper pressure for a verdict to go a particular way.

### C.

Austin argues, however, that the only possible basis for believing a juror would not feel coerced upon twice resuming deliberations under these circumstances would be if the juror was confused, not necessarily a dissenter. Austin stresses that the judge himself apparently believed the juror was merely confused—a premise that cannot properly be assumed, he says, absent an inquiry to that effect, which the judge did not make. Austin accordingly urges us to recognize the importance of the right of dissent by considering this case on the only premise that would clearly protect the juror's position: as in *Crowder*, 383 A.2d at 342, juror number one knew exactly what

---

of review. *Allen v. United States,* 495 A.2d 1145, 1151 (D.C.1985) (en banc). For this reason, plain error analysis was appropriate in *Artis*—and is here.

**4.** A juror's change of mind during a poll of the verdict is not unusual. *See Frady v. United States,* 121 U.S.App.D.C. 78, 83, 348 F.2d 84, 89 (en banc) ("A juror who concurs in the jury-

room, out of weakness and against his [or her] conscience, in the verdict of eleven other jurors, may express his [or her] real opinion as to punishment when given a clear opportunity in open court in the presence of the defendant."), *cert. denied,* 382 U.S. 909, 86 S.Ct. 247, 15 L.Ed.2d 160 (1965).

she was doing in dissenting from conviction on count two. It follows, says Austin, that the court should have either provided a cautionary instruction to assure the dissenting juror felt protected in her position or else declared a mistrial.

The record, however, belies Austin's contention. As Austin himself recognizes, the trial judge did perceive the dissenter was merely confused, not self-assured in dissent. Moreover, there is a record basis for the judge's perception. Soon after the judge sent the jury back to deliberate after the first aborted poll, the foreperson sent a note asking if the jurors could "make a note or carry ... a memo as to the individual verdicts." After consulting with counsel, the judge called the jury back, reiterated that he would poll only as to guilty verdicts, and took the second poll without having responded to the foreperson's note. Later, after he had sent the jury back for the second time, he told counsel during the recess: "I think the first juror is just confused. I don't think I can let them take notes." We do not find a basis for concluding this was an erroneous perception. For that reason we do not believe the court erred, absent objection, in having the jury twice resume deliberations without additional inquiry or instruction.

### D.

Even if Austin is correct that the trial court should have perceived juror number one was certain, not confused, in twice announcing "not guilty" in open court, we do not believe there was coercion enough for us to conclude, absent objection from counsel, that plain error occurred in the court's failing *sua sponte* to make further inquiry or to give the jury a cautionary instruction. The incident occurred only twice; the judge took action consistent with every juror's understanding (the ver-

dict must be unanimous); the juror was not noticeably a lone dissenter; and the judge did not use words that any juror could reasonably have taken even as a hint to decide a particular way. Obviously, if the same result occurred after several aborted polls, the emerging specter of a hung jury might leave the trial court, as well as this court, required to say the only proper course would be a careful inquiry into possible confusion or a cautionary instruction to protect dissent during further deliberations. Or, in some instances, a mistrial would be appropriate. But, on this record, we do not perceive the coercive effect Austin claims. The judge's neutral action in twice ordering resumption of deliberations without comment or fanfare does not suggest a miscarriage of justice.

We want to emphasize, however, that this is a "plain error" case. See *supra* note 3. Had defense counsel requested a careful inquiry or a cautionary instruction of the sort suggested in *Crowder*, 383 A.2d at 342 n. 11, in order to minimize any possible feeling of juror coercion which counsel believed likely under the atmosphere in court at the time, the judge's failure to give an instruction would present a different issue. Absent a defense request, however, we cannot find plain error here.[5]

### IV.

Fields challenges his conviction because the trial judge declined to grant a severance so that codefendant Austin could testify on Fields' behalf at a later trial, after the charges against Austin had been resolved and his Fifth Amendment rights no longer conflicted with his availability as a witness for Fields. Fields' argument is based on his counsel's statement in support of the severance motion that Austin's testimony would "potentially exculpate him."[6]

---

5. The court may well have acted within its discretion had it given a cautionary instruction *sua sponte* after the second aborted jury poll. But any such instruction must be carefully tailored both to prevent coercing the polled juror's response and to avoid threatening the unpolled jurors. Had the court given a cautionary instruction such as one of the formulations appel-

lant has suggested for the first time on appeal—that "any member of the jury should feel free to change his or her vote on any issue"—the entire jury might have felt coerced.

6. Counsel suggests for the first time on appeal that Austin would testify that Fields had not been the getaway driver and had not been in-

In response, the trial judge conducted a so-called *Jackson* [7] inquiry:

[DEFENSE COUNSEL]: Your Honor, I think I have made it clear that my client objects to this as well as I do. My client would provide *some information that might be exculpatory but could not fully exonerate Mr. Fields.*

THE COURT: What about his willingness to testify if the case was severed in light of all the circumstances, the inconsistent statements, and various other things?

[DEFENSE COUNSEL]: Your Honor, I would—I mean if he was given a subpoena he would, of course, have to, so that I don't think that that—

THE COURT: But he still has a Fifth Amendment.

[DEFENSE COUNSEL]: He would waive his Fifth Amendment.

THE COURT: He still has a Fifth Amendment privilege because if he were to take the stand and seek to provide exonerating information regarding Mr. Fields and that was false information or if he—he can always be subject to potential perjury prosecution.

[DEFENSE COUNSEL]: He is not willing to waive any sort of Fifth Amendment privilege at this juncture in this case because his case is pending. He is not willing to say that he will waive his Fifth Amendment privilege.

THE COURT: What if this case went to trial first and he got convicted and he was sentenced. At that point would he be willing to testify in light of all the circumstances?

[DEFENSE COUNSEL]: If he still had a Fifth Amendment privilege, he would.

THE COURT: But as I understand your representation he would not be able to *totally provide information exonerating Mr. Fields from involvement in this case.*

[DEFENSE COUNSEL]: I think that is our position.

THE COURT: The only thing I will say on the record then is that I will deny the motion for severance on the grounds stated. I don't see how else I can do it knowing that can be used in reference to my having indicated that. I will just indicate I deny the motion, that's all.

To prevail on the severance motion, Fields had to satisfy four criteria:

the exculpatory nature of the desired testimony, the desire of the movant to present [the codefendant's] testimony, the willingness of the codefendant to testify, and the demands of judicial administration.

*Jackson v. United States,* 329 A.2d 782, 788 (D.C.1974), *cert. denied,* 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975). The burden is on the moving party to satisfy the court that the testimony would be exculpatory in effect and that the codefendant is, in fact, likely to testify. *Byrd v. Wainwright,* 428 F.2d 1017, 1020 (5th Cir.1970).

*King v. United States,* 550 A.2d 348, 352 (D.C.1988). Fields gave the trial judge no specifics; thus, faced with the vague proffer of "potentially exculpatory testimony," the judge arguably would have acted well within his discretion had he denied Austin's severance motion forthwith. *See United States v. Ford,* 276 U.S.App.D.C. 315, 318, 870 F.2d 729, 732 (1989) (conclusory statement by counsel not enough to establish required "nature and effect" of codefendant's alleged exculpatory testimony); *United States v. Espinosa,* 771 F.2d 1382, 1408 (10th Cir.) (defendant must demonstrate that more than "vague and conclusory" statement of "negligible weight or probative value" would be given to show codefendant's testimony would be "favorable"), *cert. denied,* 474 U.S. 1023, 106 S.Ct. 579, 88 L.Ed.2d 561 (1985).

The trial judge, however, was willing to pursue Fields' concern and questioned Austin's counsel ex parte. The resulting *Jackson* inquiry, quoted in full above, revealed

---

volved in the shooting incident in any other way.

**7.** *See Jackson v. United States,* 329 A.2d 782 (D.C.1974), *cert. denied,* 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975).

that Austin "might" provide some exculpatory testimony but it would not "fully" or "totally" exonerate Fields. At this point the judge—who could not have appropriately elicited details from Austin or his counsel because of Austin's Fifth Amendment privilege, *see King*, 550 A.2d at 352–53—could nonetheless have granted the severance and scheduled Fields for a later trial, trusting that Austin would provide testimony exculpatory of Fields. But the trial court was not obliged to do so. Courts have warned against permitting codefendants to use severance motions to manipulate the order of their trials. *See United States v. Parodi*, 703 F.2d 768, 779–80 (4th Cir.1983); *United States v. Becker*, 585 F.2d 703, 706 (4th Cir.1978), *cert. denied*, 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 50 (1979). As *King* demonstrates, it is up to the codefendant moving for severance to meet the *Jackson* criteria. It is "unwise and inappropriate for the trial judge to inject himself into the controversy," *King*, 550 A.2d at 352–53, by seeking to elicit information—undoubtedly constitutionally protected information in many cases—unless the defendant is able to provide a concrete basis for the judge to believe that exculpatory information would be forthcoming.

Because Fields' proffer of "potentially exculpatory information" was so vague, the trial judge arguably went beyond his obligation by questioning Austin's counsel ex parte. The resulting colloquy revealed the limits of a court's ex parte inquiry, given legitimate Fifth Amendment concerns. If Fields had provided a more detailed and convincing proffer justifying further judicial inquiry, perhaps the analysis here would be different. But, on this record, the trial judge did not abuse his discretion by denying Fields a severance in the vague hope of receiving "potentially exculpatory testimony" from codefendant Austin.

8. Fields and Lumpkin were cousins. The house belonged to Fields' and Lumpkin's uncle. When Lumpkin, previously, had been arrested on an unrelated charge in the county where his uncle

## V.

Fields also argues that the trial court erred: in denying his motion to sever his case from that of his codefendants for still other reasons; in refusing to suppress the fruits of the government's search of his house; and in allowing in evidence taped conversations between Fields and a friend. None of these contentions has force, and each merits only summary treatment.

### A.

Fields moved pretrial for severance on the ground the evidence against him was *de minimis* compared to the evidence against Austin and Lumpkin. At least as to the conspiracy, the evidence of Fields' complicity was not *de minimis* when compared to that of the codefendants, as claimed. Accordingly, severance before trial was not required. *See Catlett v. United States*, 545 A.2d 1202, 1209 (D.C.1988), *cert. denied*, 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989).

■ Fields also claims he was entitled to a severance during trial. He says he was prejudiced when Lumpkin's counsel questioned a witness about a threat allegedly implicating Fields. This argument fails because it does not fit any of the categories we have held are sufficient to justify severance during trial, *see Catlett*, 545 A.2d at 1210, and we perceive insufficient prejudice on this record to justify creation of a new category.

### B.

■ After investigation, police obtained a search warrant for the house in which Lumpkin was believed to live. They conducted a search that revealed, among other things, two .357 magnum shell casings and a half full box of .357 magnum ammunition. The house was Fields' residence.[8] Fields moved to suppress the shell casings and ammunition on the ground that the search warrant did not specifically mention

lived, he had listed his uncle's house as his residence. Thus, the search warrant and the affidavit accompanying the warrant mentioned Lumpkin's, not Fields', name.

his name and that the police did not have probable cause relating specifically to him.

The court did not err in denying the motion to suppress. Fields' suggestions that the warrant was insufficient because it did not specifically name him and, in any event, because the government lacked probable cause are frivolous. The warrant was not facially defective with respect to the residence or the items for which the police were searching, *see United States v. Leon,* 468 U.S. 897, 914, 923, 104 S.Ct. 3405, 3416, 3421, 82 L.Ed.2d 677 (1984); there was no allegation of improper police conduct, *see, id.* at 914, 923, 104 S.Ct. at 3416, 3421; *United States v. Edelen,* 529 A.2d 774, 785 (D.C.1987); and the affidavit in support of the warrant more than showed probable cause.

### C.

■ Finally, Fields contends the trial court erred in admitting in evidence taped conversations between Fields and Lorenzo Logan, a friend and the person who drove Fields and Austin to the first meeting with the officers.[9] The trial court ruled Fields' statements were admissions against interest and that their probative value outweighed any prejudicial impact. The trial court did not abuse its discretion in allowing the tape in evidence because it tended to show Fields' consciousness of guilt, *see Byrd v. United States,* 502 A.2d 451, 452 (D.C.1985), and the court did not err in assessing its net probative value, *see Smith v. United States,* 312 A.2d 781, 785 (D.C.1973).

### VI.

Austin maintains that his convictions for assault with a dangerous weapon upon Officers Awkard and Pumphrey merge with his convictions for assault upon the same officers with intent to commit robbery while armed. *See Leftwitch v. United States,* 460 A.2d 993, 996–97 (D.C.1983).

Lumpkin makes the same contention as to his convictions for assaulting Officer Awkard. Lumpkin also contends that his conviction for assault upon Officer Pumphrey with intent to kill while armed merges with his conviction for assault upon Pumphrey with intent to commit robbery while armed.

The government acknowledges that these merger issues are complex. Furthermore, because the sentences were concurrent, the government—on the assumption (without agreeing) that appellants' merger arguments are correct—does not object to vacating these convictions of Lumpkin and Austin. We find no reason to reject these concessions and, accordingly, order the trial court to vacate Lumpkin's convictions for assault with a dangerous weapon upon Awkard and for assault upon Pumphrey with intent to commit robbery while armed. We also order vacation of Austin's convictions for assault with a dangerous weapon upon Awkard and Pumphrey.

### VII.

Accordingly, we conclude that the judgments on appeal must be affirmed, except for (1) Lumpkin's convictions for assault with a dangerous weapon upon Awkard and for assault upon Pumphrey with intent to commit robbery while armed, and (2) Austin's convictions for assault with a dangerous weapon upon Awkard and Pumphrey. The case is remanded for vacation of these convictions.

*So ordered.*

ROGERS, Chief Judge, concurring in part and dissenting in part:

I join the majority opinion except with respect to the jury poll issue.

The court reaffirmed in *Crowder v. United States,* 383 A.2d 336 (D.C.1978), the long-acknowledged view that an important purpose of a jury poll is "to determine with certainty that every juror approves of the

---

9. Once he was in police custody Logan, after police prompting, called Fields on Fields' beeper number. Fields promptly returned Logan's call. After Logan told Fields that the police had questioned him, Fields asked Logan: "You tell them you was the driver[?]" Logan responded: "Yeah, I told them I was the driver." Fields also asked: "You didn't say nobody's names?" Logan replied: "No names, no names, I just left."

verdict as returned, and that no juror has been coerced or induced to agree to a verdict with which he dissents." 383 A.2d at 340. *See Arnold v. United States,* 511 A.2d 399, 417 (D.C.1986) (citing *Humphries v. District of Columbia,* 174 U.S. 190, 194, 19 S.Ct. 637, 638, 43 L.Ed. 944 (1899)). Consequently, the court has cautioned trial judges to avoid potentially coercive actions during jury polls because of the likelihood that even minimal coercion during deliberations may cause a dissenting juror to surrender his or her views despite sincere disagreement with the verdict supported by the majority. *See, e.g., Kendall v. United States,* 349 A.2d 464, 466 (D.C.1975); *see also Perkins v. United States,* 473 A.2d 841, 846 (D.C.1984). We also have made clear that while deference is owed to the trial judge's view of circumstances surrounding a jury poll, each case turns on its own facts. *See Crowder, supra,* 383 A.2d at 341.

A complete statement of the interaction between the judge and the jury after its members completed their initial deliberations is required. *Id.* at 341. The jury first returned to the courtroom after advising the trial judge by note that it had reached a verdict. The foreperson advised the clerk that the jury had reached a unanimous verdict as to each defendant on all counts. When the foreperson began to announce the jury's verdicts, she informed the judge that the jury had used "a minor charge" on one of the counts involving appellant Austin. The judge called counsel to the bench and advised that if the jury had not reached a unanimous verdict on the greater charge he was going to send the jury back to the jury room for further deliberations. In response to the judge's inquiry in open court, the foreperson explained that the jury had used a "lesser charge," and when pressed by the judge to clarify whether the jury had reached a verdict on the greater charge, the foreperson stated, "Not guilty, then." The judge instructed the jury, "You need to go back and continue your deliberations." The jurors thereupon returned to the jury room.

When the jury later returned to the courtroom, the foreperson announced the jury's verdicts on each count for each defendant, and the jurors collectively responded affirmatively to the question whether the announced verdict was their verdict. Counsel for defendant Austin then requested a poll. The judge advised the jury that the poll would be only in reference to the charges for which the foreperson had announced a unanimous guilty verdict. Upon being polled on the first count, each juror announced a verdict of guilty. During polling on the second count (assault with a dangerous weapon) however, the first juror stated, "Not guilty." The judge responded by saying, "Very well. The jury will have to go back and continue their deliberations." The jury then returned to the jury room for a second time. Thereafter the jury sent a note to the judge asking whether each juror could bring a note or memo into the courtroom to keep track of the verdicts. The judge, after conferring with counsel, denied the request but agreed to instruct the jury again that he would be polling only on the guilty verdicts.

Upon the jury's third appearance in the courtroom, the judge instructed the jury:

Ladies and gentlemen, I am going to be asking you to indicate and indicate only your verdict with respect to those counts which the foreperson said your verdict was guilty. I will not be asking you your verdict in reference to those charges which the foreperson indicated that your verdict was not guilty.

I will only be asking you about those verdicts which the foreperson said your verdict was guilty.

I will be asking you to indicate whether your individual verdict on those charges that the foreperson says your verdict is guilty is guilty or not guilty.

When the second poll on the assault with a dangerous weapon charge commenced, the judge began by asking the foreperson what the jury's verdict was on count two. When the foreperson inquired regarding the identity of the assault victim, the judge instructed that he would only be asking the jurors individually about the charges which the foreperson indicated the jury's verdict

was guilty. The judge then inquired of juror number one who announced her verdict as "not guilty" for a second time. The judge stopped the poll and told the jury, "Go back out and continue with your deliberations." The jury then returned to the jury room for a third time.

While the jurors were deliberating, the judge told trial counsel that he thought the first juror "was just confused," but he did not think he could let the jurors take notes. The judge explained that note-taking would result in the jurors getting together and rendering only the verdict of the entire panel and not their individual verdicts. Trial counsel made no comment.

When the jurors returned to the courtroom, the judge again asked the foreperson for the verdict on count two and the foreperson announced guilty. The judge then instructed the jury that he would poll the jury only on those charges for which the foreperson had announced a guilty verdict. On the third poll, juror number one announced a guilty verdict on the assault count, and the judge proceeded to poll the rest of the jurors, who also announced guilty verdicts.

Viewed in its totality, the interaction between the judge and the jury casts doubt on the conclusion that juror number one's verdicts were merely the product of confusion. The foreperson had advised the judge when the jury had first returned to the courtroom that the jurors had been unable to reach unanimous verdicts on several counts and had opted to convict on lesser counts. Thereafter, the judge gave the jury simple instructions on three occasions indicating that the poll would be limited to counts for which the foreperson had announced a guilty verdict. Nonetheless, without hesitation or apparent confusion, juror number one twice stated that her verdict was not guilty. Unlike the situation in *Williams v. United States*, 136 U.S. App.D.C. 158, 419 F.2d 740 (1969) (en banc), where the record revealed several possible sources for the juror's statement to the judge that she was confused, nothing in the record, other than the trial judge's conclusory statement,[10] suggests that juror number one's verdict was the result of confusion.

This is not the first occasion on which the court has been confronted with a juror's announcement of a non-conforming verdict that was dismissed as confusion. In *Kendall, supra*, 349 A.2d 464, when polled on the first count, juror number one announced a verdict of not guilty, and upon being asked by the judge whether she had said "not guilty," she answered, "I think it was." *Id.* at 465. The judge reminded the juror that the poll was on the armed robbery count, and she reaffirmed her original statement of not guilty, emphasizing her certainty by explaining how she remembered, "Yes, we had these little cards writing down which one." *Id.* The poll of the other jurors continued on that and other counts and at the end returned to the first juror who then announced that her verdict was guilty; upon inquiry by the judge, the juror reaffirmed that her verdict was the same as those of the other jurors. On appeal the court stated:

"The government hypothesizes that the dissenting juror was confused by the multiple count indictment and such confusion was understandable since the trial was the first heard by this jury panel. However plausible the government's theory, the record discloses that the first juror clearly stated as to the first count, 'I had not guilty on that.' Indeed, the trial judge rather than stopping the poll and questioning the juror to determine if she were confused by the indictment

---

10. Although the trial judge told trial counsel that he thought juror number one was confused, he did not give any reason for his conclusion. His only explanation referred to the reason he had decided not to allow the jurors to make a note of their individual verdicts. The judge's subsequent remarks in dismissing the jury suggest that he may have thought that confusion arose because the case involved multiple counts and multiple defendants, but he did not say so directly nor did he indicate that he was referring only to juror number one. Hence, the majority's reliance on the trial judge's bare statement, majority opinion at 706, is misplaced; there is nothing in the record to support the judge's conclusion with respect to juror number one.

chose to continue the poll. Thus, both the juror's response and the trial judge's actions do not support a conclusion that she was confused."

*Id.* at 466–67 (footnotes omitted). The court reversed the convictions, notwithstanding the absence of objection by defense counsel to the continuation of the poll. *Id.* at 467.[11]

Likewise, in *Jones v. United States*, 273 A.2d 842 (D.C.1971), the court reversed, noting that when juror number one registered a non-conforming verdict, the judge "should have been alerted (and, no doubt, he was) that there might not be unanimity in the verdict." *Id.* at 844. The court concluded that after the judge interrupted the poll, explained the question, and the juror *again* indicated "not guilty," continuing the poll on that count was coercive. *Id.* "Because, in this case, the repeated efforts of the trial judge to obtain a unanimous verdict may have had a coercive effect upon the dissenting juror, 'we cannot say with assurance that the jury freely and fairly arrived at a unanimous verdict.'" *Id.* at 845 (quoting *Matthews v. United States*, 252 A.2d 505, 507 (D.C.1969)). These cases followed our decision in *Pearson v. United States*, 262 A.2d 337 (D.C. 1970) (error to continue poll after dissenting verdict announced).[12]

The trial judge in the instant case avoided the error of continuing the poll on the assault count and was not confronted with knowledge of the numerical division of the jury as has occurred in other cases. Nonetheless, he failed to be sufficiently alert to the indications of nonunanimity. The likelihood of nonunanimity arose both from the foreperson's initial announcement that the jury could not reach a unanimous verdict on certain counts, for which a lesser charge was employed, and from juror number one's first announcement of a non-conforming verdict on count two. In *Williams, supra,* Judge Leventhal distinguished between cases in which "the proceedings in court ... [give] every indication that although one juror was confused in her answers, there had been unanimity in fact, and the return to the jury room served merely to obtain clarity in the expression of the previous fact of unanimity" from those in which "the announcements of the jurors make it clear that one juror differs with the others, and the return to the jury room is for the purpose of obtaining a unanimity that plainly did not exist when they first came in to announce their verdict." 136 U.S.App.D.C. at 164 n. 8, 419 F.2d at 746 n. 8. The totality of the interaction between the judge and the jury in the instant case appears to be closer to the latter situation than the former given juror number one's unequivocal dissent on two occasions.

Since juror number one was a possible dissenter, the issue is the propriety of the trial judge's responses. Important to this analysis is whether the judge conveyed to the juror that the judge had identified her as the sole dissenter, so that she (much less the other jurors) could reasonably interpret

11. The court explained:
 The request for a jury poll should immediately alert the trial judge that there may be a dissent voiced during the poll. Once a poll is begun and lack of unanimity is apparent, then Super.Ct.Crim.R. 31(d) requires that "the jury may be directed to retire for further deliberations or may be discharged." The rule itself requires action by the trial judge and an objection at this point is redundant.
 *Id.,* 349 A.2d at 467. In *Artis v. United States*, 505 A.2d 52, 59 (D.C.), *cert. denied,* 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986), the court appears to have ignored this statement in *Kendall. See M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971). The majority's effort to distinguish *Kendall* is unpersuasive. Majority opinion at 704 n. 3. *Allen v. United States*, 495 A.2d 1145, 1151 (D.C.1985) (en banc), did not overrule *Kendall.*

12. It may be coincidence, but with the exception of *Artis, supra,* 505 A.2d 52, the juror confusion or dissenting voice at issue involves a female juror and a male judge. *See Ellis v. United States*, 395 A.2d 404 (D.C.1978), *cert. denied,* 442 U.S. 913, 99 S.Ct. 2830, 61 L.Ed.2d 280 (1979); *Crowder, supra,* 383 A.2d 336; *Jackson, supra,* 368 A.2d 1140; *Kendall, supra,* 349 A.2d 464; *United States v. Brooks*, 137 U.S.App.D.C. 147, 420 F.2d 1350 (1969); *Williams v. United States*, 136 U.S.App.D.C. 158, 419 F.2d 740 (1969). There may be communication problems which require examination as well as a need to consider group dynamics and individual response by members of the opposite sex. *See generally* D. TANNEN, *You Just Don't Understand* (William Morrow & Co., Inc. New York 1990); *cf. Judicature,* vol. 74, No. 3 (Oct.–Nov.1990) 138.

the judge's actions as directed at her in a manner that suggested that the judge was attempting to compel a particular verdict. *See Jackson v. United States*, 368 A.2d 1140, 1143 (D.C.1977) (per curiam) (judges' remarks are more coercive "when obviously directed at a particular individual identified to the court, to the parties, and to her fellow jurors").

The judge's remark to trial counsel, after the jury had returned to deliberate for a third time, indicates that even if the judge did not think that juror number one was the sole dissenter, he had concluded that she was the problem. *Cf. id.* at 1142 n. 6 and accompanying text (judge's reference to "she," where jury note advising of a lone dissenter did not identify the juror, demonstrated the judge had identified the dissenter). The pattern of interaction between the judge and the jury could readily convey to a reasonable juror, as well as to other members of the jury, that the judge viewed juror number one as a lone dissenter and would accept only an announcement of a guilty verdict on the count in question. *Cf. Crowder, supra*, 383 A.2d at 342 n. 11. On three occasions the judge instructed the jury to return to the jury room for further deliberations. He did so twice in response to juror number one's announcement of a "not guilty" verdict. On neither occasion did the judge give a cautionary instruction to the jury to protect her right to dissent. Thus, the instant case is unlike *Artis, supra*, 505 A.2d 52, which the majority concludes is controlling, majority opinion at 704; in *Artis* the judge only ordered further jury deliberations once.

When the judge instructs the jury to return for further deliberation, especially in circumstances which decrease the likelihood of confusion and suggest that the judge has identified a lone dissenter, the coercive effect of returning the case to the jury increases substantially with repetition. *Cf. Jones, supra*, 273 A.2d at 845. It is not difficult to imagine a scene in the jury room, with the majority pressuring the dissenting juror to bend to the judge's implicit order that the jury resume deliberations so that she could conform her verdict; the court warned of this in *Crowder, supra*, 383 A.2d at 341 n. 11. The possibility of coercion exists even when the jury is only sent back for further deliberations one time. Thus, in *Ellis, supra*, 395 A.2d at 404, where juror number ten registered disagreement when polled on a particular count, the court observed:

> [H]ad the trial court not granted the government's motion to dismiss the contested count, and had the case been returned to the jury, we would have been faced with a situation in which coercion was more likely to have occurred as to the contested count had a verdict of guilty resulted.

395 A.2d at 408 n. 2.

The court has suggested several ways to diminish the possibility of coercion. The trial judge can stop the poll on the count and proceed to the other counts. *Artis, supra*, 505 A.2d at 58 (citing *Perkins v. United States*, 473 A.2d 841, 846 (D.C. 1984)); *In re Pearson, supra*, 262 A.2d at 337. The judge can give an instruction which points to the need for additional deliberation and at the same time assures minority jurors that they need not surrender strongly-held views. See CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 2.93 (3rd ed. 1978).[13] In *Crowder, supra*, 383 A.2d 336, moreover, the court indicated that circumstances (there, the twelfth juror had announced not guilty) may require a stronger instruction than the standard instruction 2.93, and suggested what such an instruction would say.[14] The

13. Standard Criminal Jury Instruction 2.93 (Return of the Jury After Polling) advises the jury why it is being asked to return to the jury room and also states:

> After you return to the jury room, any member is free to change his or her vote on any issue submitted to you. Each juror is free to

change his or her vote until the jury is discharged.

14. The *Crowder* instruction provides:

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do

judge also may act to clear up circumstances giving rise to juror confusion. *Williams, supra,* 136 U.S.App.D.C. at 164, 419 F.2d at 746 (juror unable to hear question).

If the protective purpose of the jury poll is to be effective, then, as the court pointed out in *Kendall, supra,* the trial judge must be sensitive to the coercive nature of the poll itself, and, as *Williams, supra,* teaches, the trial judge cannot assume that a juror's dissenting verdict is a product of confusion. Otherwise the reason for a jury poll is defeated. Accordingly, in view of the repetition in the instant case which even exceeded that in *Jones, supra,* 273 A.2d at 845, the absence of any evidence to suggest such confusion, and the absence of a protective instruction after juror number one repeated her not guilty verdict, I would reverse appellant Austin's conviction for assault with a dangerous weapon against Troy Pumphrey. *Crowder, supra,* 383 A.2d at 343 (reversing only on count for which juror announced a dissenting verdict); *Kendall, supra,* 349 A.2d at 467 (quoted at note 2, *supra*).

so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to réexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

383 A.2d at 342 n. 11. Such an instruction comports with the court's admonition in *Jackson* that "supplemental instructions to a hung jury must be carefully worded and well-timed and ... it must be made clear, in substance, that a verdict is not being demanded." *Jackson v. United States, supra,* 368 A.2d at 1143 (internal quotation marks omitted).