Gregory V. **WILLIAMS** and Herbert
Smalls, Jr., Appellants,

v.

**UNITED STATES**, Appellee.

Nos. 97–CF–421, 97–CF–604.

District of Columbia Court of Appeals.

Argued June 30, 2004.
Decided Oct. 13, 2005.

Steven H. Schiff, appointed by the court, for appellant Herbert Smalls, Jr.

Rikki D. McCoy, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney, were on the brief, for appellee.

Before TERRY and RUIZ, Associate Judges, and STEADMAN, Senior Judge.*

RUIZ, Associate Judge:

A jury convicted Gregory V. Williams and Herbert Smalls, Jr. of several weapons offenses after officers with the Metropolitan Police Department discovered in the course of a traffic stop a semiautomatic handgun lodged under the vehicle's front seat where Williams and Smalls both were sitting. In these consolidated appeals, each appellant raises a single issue. Williams contends that the government failed to introduce evidence of constructive possession sufficient to prove his guilt beyond a reasonable doubt. Smalls claims that the trial court abused its discretion by denying his motion to sever their trials, which was predicated on co-defendant Williams's offer to provide exculpatory testimony on Smalls's behalf, provided that, in so doing, he would be given immunity or protected against waiving his Fifth Amendment privilege against compulsory self-incrimination. We conclude that Smalls's contention is meritorious and therefore reverse his conviction and remand for a new trial; Williams's conviction is affirmed.

I.

While waiting at a traffic light at the intersection of First and Atlantic Streets,

Montague A. Buck, Washington, DC, appointed by the court, for appellant Gregory V. Williams.

---

* Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on October 18, 2004.

S.E., on the evening of December 27, 1995, Metropolitan Police Department Officers Dennis Spalding and Andre Kimvilakani observed four persons in a 1978 Pontiac Bonneville with its high beam headlights illuminated. Two men were seated in the front and two women in the back seat of the vehicle. Officer Spalding suspected that the car might have been stolen because he knew that the headlights on many early model General Motors vehicles incidentally shine with continual high beams when the steering column is "punched" for purposes of hot-wiring the ignition. The officers decided to conduct a traffic stop.

Shortly after the signal turned green in his favor, the driver of the Pontiac made a right turn onto Atlantic Street. When the officers activated the emergency lights on their patrol car, Officer Spalding noticed the front seat passenger—later identified as Smalls—"lean to his left far enough that his left shoulder dipped below the top of the front seat," and then sit upright again. Officer Kimvilakani noted that Smalls's "left shoulder for some reason kept dipping, dipping down towards the center." Williams, who was both the driver and owner of the car, pulled over to the curb in response to the officers' emergency lights. When Officer Spalding approached the driver's window and asked for Williams's license and registration, Williams leaned over to the glove compartment, which permitted Officer Spalding to see with his flashlight "the butt handle of a semiautomatic handgun protruding out from under the front seat on top of the transmission hub between the driver and passenger." The barrel of the handgun sat "right on top of the hub, sticking out an inch or two from the front of the seat" and within reach of both Williams and Smalls.

Before Williams could retrieve his registration from the glove box, Officer Spalding ordered him to place his hands on the steering wheel and Smalls to place his hands on the dashboard. Both did so. As Officer Spalding began to open the door, Williams removed "his right hand [from] the steering wheel and reached down to the area where the gun was." Believing that Williams was attempting to push the handgun farther under the seat, Officer Spalding ordered Williams to return his hand to the wheel. Williams appeared to comply. As Officer Spalding attempted to open the door a second time, however, Williams again moved his right hand toward the handgun. This prompted Officer Spalding to draw his weapon and inform Williams that if he did not return his hand to the steering wheel, Spalding would shoot. Williams acquiesced, but, as soon as Officer Spalding resumed opening the door, Williams removed his right hand from the steering wheel for a third time and slowly "picked up a bag of some type of chips that [was on] the seat between him and [Smalls] and moved it towards where the weapon was." Officer Spalding believed that Williams was trying to conceal the handgun. He stepped back from the car and again pointed his weapon, instructing Williams yet again to return his hands to the steering wheel. At no time did Officer Spalding or Officer Kimvilakani see Smalls make a movement towards the handgun after the car had been stopped. Having received a signal from Officer Spalding indicating that there was a gun in the car, Officer Kimvilakani arrested all four occupants of the car.

After a grand jury charged Williams and Smalls of carrying a pistol without a license,[1] possession of an unregistered firearm,[2] and unlawful possession of ammuni-

---

1. *See* D.C.Code § 22–3204(a) (1981).

2. *See* D.C.Code § 6–2311(a) (1995).

tion,[3] Smalls filed a pre-trial motion under Criminal Rule 14 to sever his trial from that of co-defendant Williams, claiming that, if the trials were severed, he would call Williams as a witness and Williams would exculpate him by testifying that he had not seen Smalls with a gun on the day of the traffic stop.[4] *See* Super. Ct.Crim. R. 14. During oral argument on the motion, Smalls's counsel elaborated on the basis for severance by explaining that

> the exculpatory testimony that Mr. Williams would provide, Your Honor, would be that when Mr. Smalls leaned forward, he saw Mr. Smalls lean forward, and that at that time he did not see Mr. Smalls with a gun.

> Further, he would also testify that he had an opportunity to observe Mr. Smalls when he entered the car, and also did not see Mr. Smalls with a gun at any time. So that, in and of itself, would be exculpatory for my client.

> I would add further that Mr. Williams does not plan to testify at this trial or his trial or a joint trial between both parties. And, as a result, my client would be prejudiced if not—if I am not allowed to call him as a witness on behalf of my client.

Williams's counsel confirmed these representations. The government opposed the motion, arguing that Smalls had not made the necessary showing for severance largely because the proffered testimony was not sufficiently exculpatory and because Smalls could not oblige the court to try Williams's case first, which was an express condition on Williams's offer to testify.

The trial judge agreed with the government that Smalls's asserted need for Williams's testimony could not dictate the court's docket. The judge stated that

> if I sever them [the cases], I decide which one is tried first, no matter who has got what privilege. And, there is nothing—and there is no law or no rule that says I can't. And, that is not—won't be an abuse of discretion or anything else. I decide which case I try first. That is not something you [Smalls] have control over. So, I don't see how his [Williams's] privilege is affected one way or the other. That is just the luck of the draw, if I happen to try one first and the other one second. I could just as easily do it vice-versa . . . .

The trial judge was of the view that if Williams secured "anything short of [an] acquittal, he [would have] problems in [that] any testimony he may . . . [have] give[n] [could be] used against him later if in fact his case [was] reversed and . . . remanded for some reason." The court seemingly did not consider the possibility—or perhaps did not wish to countenance the costs—of continuing Smalls's trial until after final resolution of any appeal that Williams might take, determining instead that Williams would testify for Smalls *only* if Williams both went to trial first and was acquitted. The court observed that such a singularly successful sequence of events "is a very speculative scenario to base severance of these cases on," and "that there is too much left to doubt for me to separate the cases in the hopes that your client [Williams]—try him first, in the hopes that he gets an acquittal."[5] The judge accordingly denied severance, reasoning that it would not serve

---

3. *See* D.C.Code § 6–2361(3) (1995).

4. Smalls did not argue in the trial court, nor does he argue now on appeal, that the cases were improperly joined under Superior Court Criminal Rule 8(b).

5. Counsel for Williams took issue with the court's suggestion that the eventual availability of his client's testimony was speculative. He stated that

> if Mr. Smalls is tried first, if my client [Williams] shows up in the courtroom at all,

the efficient administration of justice because it "troubles too many contingencies in the mix . . . ." [6]

At the joint trial, the government prosecuted its case on a theory of shared constructive possession,[7] and the jury found both appellants guilty of all charges.[8] Smalls filed a motion (and supplemental motion) for a new trial, arguing the same severance issue. Attached to the supplemental motion was an affidavit in which Williams, swore the following:

> I hereby declare, under penalty of perjury, that on the night of December 27, 1995, that Herbert Smalls, Jr., was in my clear view, both when he entered my vehicle, and during the period when the vehicle was being stopped by police. He did not put any pistol on the transmission tunnel of my automobile, nor did I see him with a pistol at any time that evening, or for that matter, at any other time. While I almost certainly would have observed it had he handled a pistol at any time he was in my car that evening, I can state categorically that he did not produce a pistol upon entering the vehicle or during the period from the time I turned onto Atlantic Street S.E. until the pistol was noticed by Officer Spalding.

The government opposed the motion by reminding the judge that the

> court denied the [pre-trial] motion [for severance of defendants] for a number of reasons. Perhaps most importantly, the court determined that mere severance of the trials would not solve the issue, if Mr. Williams were not willing to waive his Fifth Amendment privilege (which he was not). Mr. Smalls did not have the right to have the cases heard in a specific order, and if his trial preceded Mr. Williams's trial, Mr. Williams still would not testify. Moreover, even if Mr. Williams's trial occurred first, because his Fifth Amendment privilege would apply until the appellate court confirmed his conviction, it was still unlikely that he would testify at Mr. Smalls's trial.

With regard to the new affidavit, the government observed, *inter alia*, that "Williams does not state that he would

---

he will be wrapped in the Constitution. I would respectfully submit to the court that the whole notion of severing because a codefendant can give exculpatory testimony if he does not have a self-incrimination problem, contemplates that in that instance he would be tried first, so that the prospect of his availability for the testimony for the codefendant is realized.

6. Smalls had also argued that severance was justified because the government intended to introduce a statement, believed to have been uttered by Williams at the time of the traffic stop, that inculpated Smalls. The government ultimately declined to introduce this statement, and Smalls's constitutional right to confrontation was never jeopardized.

7. *See Rivas v. United States*, 783 A.2d 125, 129 (D.C.2001) (en banc) (explaining that a successful prosecution for constructive possession of contraband requires proof that the defendant (1) knew of the contraband's presence and had both (2) the ability and (3) the intent to exercise dominion and control over it).

8. A poll of the jurors revealed that each agreed with all the guilty verdicts as rendered by the foreperson. The new trial motion contains, however, the following representation by counsel for Smalls:

> In speaking with a number of the jurors it was determined that the jury spent most of their deliberations in deciding Mr. Smalls' fate and not Mr. Williams'. Some jurors indicated that Mr. Williams was convicted within five (5) minutes and Mr. Smalls after two (2) days of deliberations. Although the jurors were polled, it appeared that at least one juror was still doubtful as to her vote with respect to Mr. Smalls.

In light of the unanimous verdict, the government's opposition to the new trial motion disregarded defense counsel's description of the jury's deliberations as speculation.

testify for ... Smalls at a new trial."[9] The trial court denied Smalls's motion for new trial and these appeals timely followed.[10]

## II.

■■■ The trial court enjoys "wide latitude" in determining whether severance is required, and we therefore do not lightly conclude that the trial court has abused its discretion. *See King v. United States*, 550 A.2d 348, 352 (D.C.1988) (citations omitted); *see also Jennings v. United States*, 431 A.2d 552, 556 (D.C.1981) (noting the strong presumption in this jurisdiction that when two or more defendants are jointly charged, they also will be jointly tried). This is one of those few cases, however, where the facts and arguments on appeal compellingly indicate that the defendant was prejudicially denied a fair trial and due process of law as a result of the court's decision to deny the motion for severance. *See Jackson v. United States*, 329 A.2d 782, 787 (D.C.1974) (explaining that an abuse of discretion cannot be discerned in the absence of a concomitant determination that the joint trial constituted a denial of due process of law).

### A. *Controlling Legal Principles*

■ Superior Court Criminal Rule 14 confers upon the trial court the discretion to grant a severance of defendants "[i]f it appears that a defendant or the government is prejudiced by a joinder ...." Super. Ct.Crim. R. 14. In discussing the substantively identical Federal Rule of Criminal Procedure 14, *see* Super. Ct. Crim. R. 14 cmt., the Supreme Court of the United States has articulated a threshold burden that a movant must carry as well as a sliding scale by which the need for severance should be adjudged. In *Zafiro v. United States*, the Court cautioned trial judges against granting severance unless there is a "serious risk" that a joint trial would compromise "a specific trial right" of the movant, or otherwise stymie the jury's ability to determine reliably the movant's guilt or innocence. 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). The movant must identify not only a specific right jeopardized by a joint trial, but also the particular facts of the case that give rise to the risk of prejudice. *See id.* "When the risk of prejudice is high, a [trial] court is more likely to determine that separate trials are necessary ...." *Id.*

■■■ The risk of endangering a specific trial right might occur, for example, "if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." *Id.* (citing *Tifford v. Wainwright*, 588 F.2d 954 (5th Cir.1979) (per curiam)). In other words, among the specific trial rights that a motion for severance is intended to secure is the right to present a defense and call witnesses on one's own behalf. *See Martin v. United States*, 606 A.2d 120, 127 (D.C.1991) (citing *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)). This guarantee is a fundamental component of due process of law. *See id.* (quoting *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)). In recognition of its centrality to our system of justice, we have stated in the context of severance that "although the right to call witnesses is not an absolute one—it is trumped, for exam-

9. Apart from the implication of the government's observation, there is no evidence in the record to suggest that the parties disputed Williams's subjective intent to testify if and when his Fifth Amendment concerns were resolved.

10. Although the record contains no jacket entry, written order, or transcript of an oral ruling denying the motion for a new trial, we rely on the representation in appellant's brief—not disputed by appellee—that the trial judge ruled upon and denied the motion.

ple, by a witness'[s] valid invocation of the privilege against self-incrimination—*the fundamental character of that right is a major factor to be considered in the balancing process*" and "[a]ny interest which the state may have in restricting who may be called as a witness is subject to close scrutiny . . . ." *Id.* (emphasis added) (quoting *King,* 550 A.2d at 353).

■ We have established that in assessing the risk of prejudice from joinder in circumstances where a co-defendant proffers exculpatory testimony, the trial court should consider: (1) the exculpatory nature and effect of the proposed testimony, (2) the desire of the movant to present the testimony, (3) the willingness of the co-defendant to testify, and (4) the demands of judicial administration. *See Jackson,* 329 A.2d at 788 (citing *Byrd v. Wainwright,* 428 F.2d 1017, 1019–20 (5th Cir. 1970)); *see also Sterling v. United States,*

691 A.2d 126, 135 (D.C.1997). The burden lies with the moving party to satisfy the court that the testimony would be exculpatory in effect and that the co-defendant is reasonably likely to testify. *See King,* 550 A.2d at 352 (citing *Byrd,* 428 F.2d at 1020). Thus, a conclusory assertion on the part of the movant that severance is necessary to enable him or her to present the exculpatory testimony of a co-defendant is insufficient.[11] *See Lumpkin,* 586 A.2d 701, 707 (D.C.1991). We now turn to discuss the trial court's balancing of the factors relevant to the motion for severance in this case.

## B. *Analysis*

### 1. *The Exculpatory Nature of The Desired Testimony*

During oral argument on the pre-trial motion for severance, counsel for Smalls informed the court that

---

**11.** We believe our test is effectively identical to the standard cited by the government and articulated with slightly greater particularity by the United States Court of Appeals for the District of Columbia Circuit, which states,

> [t]o establish a *prima facie* case for severance . . . the movant must demonstrate: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) the exculpatory nature and effect of the testimony; and (4) the likelihood that the co-defendant will testify if the cases are severed. Once the movant makes that threshold showing, the trial court must then: (1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider the effects on judicial administration and economy; and (4) give weight to the timeliness of the motion.

*United States v. Ford,* 276 U.S.App.D.C. 315, 317, 870 F.2d 729, 731 (1989), *cited with approval in Lumpkin,* 586 A.2d at 707. Although we do not explicitly require a demonstration of a bona fide need for the testimony, the absence of such need—as where, for example, the desired testimony is cumulative of

other available evidence—would seriously discount the exculpatory effect of the testimony, which the trial judge is explicitly required to consider. Similarly, "the significance of the testimony in relation to the defendant's theory of the case," *id.,* is inherent in the assessment of the testimony's "exculpatory . . . effect." *King,* 550 A.2d at 352 (citing *Byrd,* 428 F.2d at 1020).

State courts that have confronted severance requests based on the need for a co-defendant's testimony typically have followed this same approach. *See State v. Sanchez,* 143 N.J. 273, 670 A.2d 535, 543 (1996) (citing state cases using federal standards). Vermont has taken a very different tack, however, creating a presumption against a joint trial upon a motion for severance. *See* Vt. R.Crim. P. 14(b)(2)(D) (2005) ("On motion of a defendant . . . the court *shall grant* severance of the moving defendant *unless* the court finds that there is no reasonable likelihood that that defendant would be prejudiced by a joint trial.") (emphasis added). Texas has also departed from the majority approach by providing that in all cases where severance is granted the defendants may dictate the order in which they are to be tried. *See* Tex.Code Crim. Proc. Ann. art. 36.10 (Vernon 2005).

the exculpatory testimony that Mr. Williams would provide, Your Honor, would be that when Mr. Smalls leaned forward, he saw Mr. Smalls lean forward, and that at that time he did not see Mr. Smalls with a gun.

Further, he would also testify that he had an opportunity to observe Mr. Smalls when he entered the car, and also did not see Mr. Smalls with a gun at any time.

The government opposed the motion by arguing that Williams's proffered testimony "only establishes that he had certain perceptions of what the other man did. That's all it does and that is not exculpatory. That's not sufficient to have two separate trials." The court initially disagreed, stating "I think it [the testimony] is. I think it's entirely exculpatory." The court later retreated from this position, however, stating that

I don't think this proffer is enough for me to say that this man did not have a gun .... In fact the driver of the vehicle saw Mr. Small[s] prior to him entering the car, he had an ample and extensive opportunity to observe Mr. Smalls and never saw him with a gun. And to say he didn't see him with a gun and to say that he didn't have a gun is two different things.... I still have concerns on that whether this is exculpatory. It's still in the nature of—I mean, to me, it's equivocal.

When the discussion continued nearly six months later, still before trial, the judge

returned to his original view, noting simply that Williams's testimony "is exculpatory." By the time concluding arguments were made on the matter, the government acknowledged the exculpatory nature of the testimony. The prosecutor stated,

[i]f Mr. Williams were to take the stand and say, "I didn't see Mr. Smalls with the gun," certainly that would be of benefit to Mr. Smalls.

I don't think that that is completely exculpatory. I think that I would still argue that just because he didn't see him with it—but, in any event, are you not supposed to take the credibility of the witness into account at this stage as to what his proffer would be. And, that would be exculpatory.

And, clearly, if he were to say that, Mr. Smalls would want him to testify. But, those are not the only factors that the court is to take into account ....

On appeal, the government contends that Smalls did not carry his burden of demonstrating the need for severance because the proposed testimony was not "conclusively exculpatory." The government's position is that the mere fact that "Williams did not *see* Smalls with a gun does not mean that Smalls did not, in fact, have a gun." In support of this argument, the government curiously cites *Martin,* which rejected "the proposition that the codefendant's testimony must 'fully' exonerate a defendant seeking a severance." *Martin,* 606 A.2d at 128 n. 20 (explicating *Lumpkin,* 586 A.2d at 706–708).[12] A co-

---

12. For this reason, the government's argument that Williams's testimony could not "conclusively insulate" Smalls from conviction because Williams failed to claim sole responsibility for the gun is also unavailing. Similarly, the government's assertion that the proffered testimony was not sufficiently exculpatory to warrant severance because it "would have supported the officers' testimony that they saw Smalls dip down towards the

center of the car" is meritless because claiming that the proffered testimony provides a basis for impeachment is simply another way of saying that the testimony is not conclusively exculpatory. *See Martin,* 606 A.2d at 128 (noting that the proffered testimony was damaging in so far as it placed appellant at the scene of the crime, but finding that this "is not dispositive" of the question of whether the

defendant's testimony need not supply proof-positive of the movant's innocence; rather, the testimony must be "substantially exculpatory." *Ford*, 276 U.S.App.D.C. at 318, 870 F.2d at 732 (quoting *United States v. DeLuna*, 763 F.2d 897, 920 (8th Cir.1985)). As the trial court acknowledged, Williams's proffered testimony that "he did not see Mr. Smalls with a gun"— either when Smalls entered the car or when he leaned over in the car—had powerful exculpatory potential because it suggested that Smalls was never in possession of the gun found in the car. If credited, it directly contradicted a fact necessary to prove two elements of the offense, as Williams's testimony would have established that the physical movement made by Smalls that the officers observed was unrelated to his knowledge that there was a handgun in the car or to his attempt to exercise control over it. *See Rivas*, 783 A.2d at 129 (explaining that the elements of constructive possession are the defendant's knowledge of the contraband's presence and the ability and intent to exercise control over it).

Williams's substantially exculpatory testimony, moreover, was "essential" to Smalls's defense. *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933. The only appreciable difference between Smalls, who was charged, and the two women sitting in the rear of the Pontiac, who were not charged, was his proximity to the gun and the alleged dipping of his shoulder beneath the crest of the car's front seat. Proximity, without more, is unlikely to be sufficient to prove constructive possession, particularly where there are others present in similar proximity to contraband. *See Rivas*, 783 A.2d at 130. The dipping motion observed by the police officers was the only evidence that could have supplied the crucial link to the gun in this case. But Williams's proffered testimony is in other respects sufficiently ex-

testimony, if believed by the jury, while corroborating that Smalls made the movement the officers observed, would have precluded the necessary inference relating it to the gun. Thus, unlike in *United States v. Reese*, 2 F.3d 870 (9th Cir.1993), Williams's testimony would not "merely contradict portions of the government's proof ... leaving other inculpatory evidence *that in and of itself would be sufficient to support a conviction.*" *Id.* at 892 (emphasis added). This testimony, if credited, would also have corroborated Smalls's own testimony that the movement the officers observed was his turning to look back at the patrol car as they were being pulled over for the traffic stop. Moreover, it provided a basis for the jury to infer that if the gun did not belong to Smalls, Williams was the likely owner. Thus, the jury might well have believed Williams, because to the extent he exculpated Smalls, he inculpated himself. *See Chambers*, 410 U.S. at 299, 93 S.Ct. 1038 (explaining that the rationale undergirding the hearsay exception for statements against penal interest is that a person is unlikely to fabricate a statement against his or her own interest at the time the statement is made).

Although the judge deemed Williams's proffered testimony to be exculpatory, it appears that the judge viewed the testimony in isolation, without considering its exculpatory value in light of the relatively weak government case, which depended on the inference from the dipping action observed by the officer. *See Sanchez*, 670 A.2d at 544 (noting that "the trial court must focus on the substance and quality of the proffered testimony, and attempt to ascertain the testimony's exculpatory value"); *see also Johnson v. United States*, 398 A.2d 354, 364 (D.C.1979) ("the requirement that the decision-maker compile a record makes certain that the facts of the culpatory to warrant severance).

case do not escape his attention and makes it more probable that the decision-maker will exercise his discretion in a proper manner"). Nor does the transcript reflect that the judge gave due weight to Smalls's due process right to call witnesses in his own defense. On this record, we cannot say that the trial court considered "the fundamental character of that right [as] a major factor ... in the balancing process" or that the government's interest in restricting Smalls's ability to call Williams as an exculpatory witness was subjected to "close scrutiny." *Martin,* 606 A.2d at 127 (quotations omitted). Rather, the trial court "accorded too little (if any) recognition to [Smalls's] right to present his defense." *Id.* at 132.

### 2. *The Desire of The Movant to Present The Testimony*

Beginning with his pre-trial motion and continuing through the next hearing, conducted six months later, Smalls urged the trial court to grant his severance motion so that Williams could provide exculpatory testimony in a separate trial. Smalls also renewed the motion during trial. He additionally pressed the matter in a post-conviction motion (shortly followed by a supplemental motion) for a new trial. In support of his supplemental motion, Smalls augmented his earlier proffer by appending an affidavit signed by Williams in which he swore that Smalls "did not put any pistol on the transmission tunnel of my automobile, nor did I see him with a pistol at any time that evening . . . ." In its ruling the trial court did not question Smalls's intent, and the government conceded during oral argument that Smalls genuinely desired to present Williams's testimony. We agree that the record supports that Smalls vigorously pursued Williams's testimony.[13]

---

**13.** We limit the legal significance of the post-conviction new trial motion and its supporting affidavit to the second *Jackson* prong and do not separately review the trial court's denial of that post-trial motion because Smalls raises no argument challenging the ruling and, perhaps not coincidentally, we do not have a record sufficient to evaluate the trial court's decision. *See Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C.1982) (explaining that, because judgments of the trial court are presumed to be valid, the appealing party bears the burden of affirmatively showing that error occurred by providing an adequate record documenting the error). The post-trial motion for a new trial and its supporting affidavit are a matter of record, however, and their mere filing is evidence of Smalls's continuing desire to present Williams's testimony. We do not rely on the substance of the affidavit in our consideration of the first and third *Jackson* prongs, namely, the exculpatory nature of the proffered testimony and Williams's willingness to testify, as it was not before the trial court when it made the challenged rulings denying severance before and during trial. We therefore reserve for another day a question which arose during oral argument: Whether the affidavit operated as a waiver of Williams's Fifth Amendment privilege against compulsory self-incrimination such that the express condition on his offer to testify was no longer necessary. *Compare United States v. Berry,* 670 F.2d 583, 605 (5th Cir.1982) ("[Defendant], however, waived what rights he might have had under the Fifth Amendment when he filed with the court an affidavit stating that he would testify in [co-defendant's] behalf if [defendants'] trials were severed and [defendant's trial] was held first."), *with United States v. Trejo–Zambrano,* 582 F.2d 460, 464 (9th Cir.1978) ("Nor did [co-defendant] waive his right to refuse to give self-incriminating testimony when he executed the incriminating affidavit in support of [defendant's] severance motion. A waiver of the Fifth Amendment privilege at one stage of a proceeding is not a waiver of that right for other stages."); *see also United States v. Cain,* 544 F.2d 1113, 1117 (1st Cir.1976) ("It is hornbook law that the waiver is limited to the particular proceeding in which the witness appears."); *Jeffries v. United States,* 215 F.2d 225, 226 (9th Cir.1954) (stating that, where a third party swore an affidavit in support of the defendant's new trial motion in which the

### 3. *The Willingness of The Co-Defendant to Testify*

The government contends that the critical factor underlying the trial judge's severance analysis was Smalls's failure to demonstrate a reasonable likelihood that the proffered testimony would be forthcoming. *See Ford,* 276 U.S.App. D.C. at 317–18, 870 F.2d at 731–32. The government cites *Ford* for the proposition that where a co-defendant's offer to testify is conditioned on his case being tried first, the defendant cannot demonstrate to a reasonable likelihood a co-defendant's willingness to testify. *See id.* (citing, *inter alia, United States v. Blanco,* 844 F.2d 344, 352–53 (6th Cir.1988) ("Here, although [the co-defendant] purported to waive his Fifth Amendment privilege, the waiver was illusory because it was conditioned upon his being tried before [the appellant].")); *United States v. Espinosa,* 771 F.2d 1382, 1408 (10th Cir.1985) (explaining that the requirement of a showing of willingness to testify if there is a severance is not met when that offer to testify is further conditioned on the co-defendant's case being tried first) (citing *United States v. Parodi,* 703 F.2d 768, 779 (4th Cir.1983)); *United States v. Gay,* 567 F.2d 916, 919–20 (9th Cir.1978) (holding that the trial court did not abuse its discretion in "refusing to accede to [co-defendant's] conditional offer to present exculpatory testimony"); *see also United States v. Washington,* 297 U.S.App. D.C. 73, 80, 969 F.2d 1073, 1080 (1992) ("Assurance conditioned on one defendant being tried before the other fails to satisfy the elements of the prima facie case [for severance].") (citing *Ford,* 276 U.S.App. D.C. at 317–18, 870 F.2d at 731–32).

■ Although this court has not specifically addressed the issue, our case law signals a general assent to the notion that a trial court may take into account the conditional nature of the offer to testify against granting a motion for severance.[14] In *Lumpkin,* the court determined that a trial judge is not obligated to assume a movant's burden to establish the "nature and effect" of a co-defendant's purported exculpatory testimony by conducting a *Jackson* inquiry *sua sponte.* 586 A.2d at 707–708. Because the trial judge happened to do so in that case, we observed in *dicta* that the judge

> could ... have granted the severance and scheduled [the defendant] for a later

affiant stated that he had committed the robbery of which the defendant had been convicted, the affiant could invoke the privilege against compulsory self-incrimination if a new trial were granted and he were called as a witness); *Ginyard v. United States,* 816 A.2d 21, 33 (D.C.2003) (noting "the general rule is that a witness who voluntarily testifies in one proceeding does not waive his Fifth Amendment privilege in a separate proceeding") (quoting *Salim v. United States,* 480 A.2d 710, 713–14 (D.C.1984)).

14. Most of our jurisprudence focuses on the movant's failure to establish the exculpatory nature of the proffered testimony. *See Jackson,* 329 A.2d at 788 & n. 12 (holding that the trial judge did not abuse discretion in denying the severance motion because the proposed testimony was not sufficiently exculpatory in

effect); *Lumpkin,* 586 A.2d at 708 (holding that "the trial judge did not abuse his discretion by denying [the defendant] a severance in the vague hope of receiving 'potentially exculpatory testimony' from codefendant"); *King,* 550 A.2d at 352 (affirming the trial court's denial because the defendant's "failure to make an adequate proffer could reasonably be viewed as her counsel's tactical decision to avoid revealing the defense case"). There is, however, one case that concerned the codefendant's willingness to testify. *See Sterling,* 691 A.2d at 135 (finding no abuse of discretion where co-defendant's counsel "indicated that a final decision regarding whether [he] would testify had not been made"). Unlike in *Sterling,* Williams's offer to provide exculpatory testimony was not uncertain, rather it was definite, but subject to one condition.

trial, trusting that [the co-defendant] would provide testimony exculpatory of [the defendant]. But the trial court was not obliged to do so. Courts have warned against permitting codefendants to use severance motions to manipulate the order of their trials. *See United States v. Parodi,* 703 F.2d 768, 779–80 (4th Cir.1983); *United States v. Becker,* 585 F.2d 703, 706 (4th Cir.1978), cert. denied, 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 50 (1979).

*Lumpkin,* 586 A.2d at 708. Certainly, the potentially manipulative use of a severance motion so as to make testifying a virtually "risk-free" proposition for the co-defendant that could invite fabrication is a proper consideration in deciding whether or not to grant severance. The government's argument, however, sweeps more broadly than any of our observations in prior decisions; the government asks us to adopt as a general rule that a movant can never demonstrate to a reasonable likelihood a co-defendant's willingness to testify if the co-defendant's offer is conditioned on his case being tried first. We do not believe that the law is as implacably rigid as the government suggests.

▆▆▆ The cases upon which the government relies are based on the rationale that "Rule 14 [should not be read] as a mechanism for alleged co-conspirators to control the order in which they are tried." *Ford,* 276 U.S.App. D.C. at 317, 870 F.2d at 731 (alteration in original) (quotation and citations omitted). We fully agree. A motion for severance filed as a mechanism to control the order of trial subjugates the trial court's docket to the will and whim of the movant and constitutes a quintessential form of manipulation spurned by this court in *Lumpkin,* 586 A.2d at 708. But it does not follow that a defendant's request to sequence severed trials, in order both to exercise his due process right to present

witnesses in defense and to accommodate a co-defendant's Fifth Amendment privilege against self-incrimination, necessarily constitutes evidence that Rule 14 was invoked solely for the purpose of manipulating the order of trial. Where application of the first and second *Jackson* factors indicates that a defendant has vigilantly moved for severance in order to secure a co-defendant's genuinely exculpatory testimony, the consequential request to sequence the trials to safeguard the Fifth Amendment privilege of the witness is likely to be the norm and should not, on its own, automatically lead to denial of the severance motion on the ground that the co-defendant is not reasonably "likely to testify." *King,* 550 A.2d at 352. Rather, it is one factor, although perhaps a significant one, to be considered in the context of a given case. To give dispositive effect to the contingent nature of a co-defendant's offer to provide exculpatory testimony would, in our view, demand too much of human nature by requiring that the co-defendant fall on his sword, and would distort the *Jackson* test, which we have described as being a "balancing process" of four considerations, not a compartmentalized litmus test. *Martin,* 606 A.2d at 127. Such balancing is made necessary by the competing goals embodied in Rule 14, namely, effective judicial administration on the one hand, and, on the other, a defendant's fundamental due process right to present a defense by calling defense witnesses. Lastly, the government's categorical rule is contrary to the nuanced approach the Supreme Court has announced, for the "risk of prejudice [arising from a joint trial] will vary with the facts in each case . . . . When the risk of prejudice is high, a [trial] court is more likely to determine that separate trials are necessary . . . ." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. In order to assess the risk of prejudice, the trial court must take into account more than just the conditional na-

ture of the offer to testify, but rather, the exculpatory nature and effect of the proposed testimony on the trial as a whole. Only then may the court determine the precise prejudice arising from the absence of the testimony and weigh the four *Jackson* factors in coming to a decision whether to sever the trials. *See Jackson,* 329 A.2d at 788.

> [T]rial courts should [not], in all cases, reject an offer of a co-defendant witness to provide exculpatory testimony conditioned on a separate trial prior to that of the movant. Indeed, there is no question ... that the purpose of a severance is more fully implemented when the co-defendant witness is tried first, and consequently is not deterred from providing exculpatory testimony by the prospect of forfeiting his Fifth Amendment privilege.

*Gay,* 567 F.2d at 921 (internal record citation omitted).

Consistent with the test we established in *Jackson,* the question thus becomes whether Smalls demonstrated a reasonable probability that Williams would testify. *See King,* 550 A.2d at 352. The trial court did not focus on this precise question, but the record reveals that during pre-trial argument on the motion for severance, counsel for Smalls indicated not only that Williams would testify if the motion were granted, but also explained the substantive content of his testimony and its importance to the defense. Williams's counsel was present during the proffer and con-

firmed its veracity before the judge. The fact that both counsel apprised the trial court of the problem posed by Williams's Fifth Amendment privilege and the proposed solution significantly supports the conclusion that Williams's testimony was reasonably likely to be forthcoming.[15] We do not doubt that the trial court could properly factor the conditional nature of Williams's offer in deciding the severance motion, but under the balancing test we have established, it could not make that the deciding factor in light of the proffer made in this case.[16] *See Lumpkin,* 586 A.2d at 708. While it would be an overstatement to say that Williams's testimony—when proffered—was guaranteed to be available at a separate trial, Smalls sufficiently demonstrated a reasonable likelihood that Williams would testify after his prosecution was concluded that it should have been weighed along with the exculpatory nature of his proffered testimony, in favor of severance, subject to consideration of the effect of granting severance on the system of justice. We now turn to this last factor.

#### 4. *The Demands of Judicial Administration*

The trial court focused almost exclusively on the need to accommodate Williams's Fifth Amendment privilege, and determined that the *only* sequence of events that would satisfy that concern was if Williams were tried first and that trial concluded in an acquittal by the jury. This, the court found, was too speculative

---

**15.** As already noted, after the trial, when Williams had been convicted, he signed an affidavit detailing what his testimony would be, which supported counsel's proffer made pretrial.

**16.** In a case where the proffer is not as specific as the one made in this case, the trial court, in its discretion, could well require a more detailed proffer as to the content and pro-

posed timing of the testimony in order to be better able to balance the conditional nature of the proffer against its exculpatory effect. Subject to the limitations imposed by the Fifth Amendment privilege against self-incrimination, the trial court could also require more than the proffer of counsel, such as an affidavit or recorded deposition testimony. See note 13, *supra.*

to justify severance, and "trouble[d] too many contingencies in the mix" to serve the needs of effective administration of justice.

By limiting its consideration to the situation in which Williams would be acquitted, the trial court's determination was driven by the uncertainty of jury verdicts in its assessment of the severance motion. However, the motion to sever posited a single contingency—final resolution of Williams's Fifth Amendment privilege against compulsory self-incrimination—which could have been satisfied either by an acquittal or by affirmance of a conviction on appeal. Although the trial court could attempt to evaluate the evidence to prognosticate the outcome of a trial—and perhaps of an eventual appeal—it is an exercise fraught with speculation and the uncertainties that can arise in the course of an imagined trial. In contrast, the costs associated with waiting for the actual outcome of the prosecution could more readily be ascertained. Instead, the court stressed its own discretion to control the order of trial, without substantively considering the potential benefits and costs of these different eventualities.

▮ The issue is not who controls the order of trial, for surely it is the trial judge and not the defendant. But that control must be the product of a considered decision, and not, as the trial court commented here, "the luck of the draw." In considering a defendant's motion to sever in order to present a co-defendant's testimony, the judge must determine whether the proposed testimony is suffi-ciently important to the defense—marked by its substantially exculpatory nature and essential role in the defense theory of the case—that the trial judge should consider sequencing the trial in such a way to make it possible.[17]

In all cases, there will be a price to be paid in terms of efficiency when criminal trials are severed. That is a given. Delay is, of course, the foremost concern; yet its significance in any particular case largely depends on the consequent prejudice to the government. If the passage of time diminishes the government's ability to preserve evidence and witness testimony, or otherwise prosecute its case effectively, delay will weigh against granting severance, and may even be of controlling weight where, for example, it would imperil the government's ability to present material evidence. Here, the court did not evaluate the potential prejudice that the government was likely to suffer if its prosecution were delayed until after Williams's trial and possible appeal. The government did not assert any such prejudice before the trial court nor has it done so on appeal. The effective administration of justice is not a function of prompt prosecution alone, but broadly encompasses the court's institutional interest in efficaciously deploying, and thereby conserving, judicial resources. In this regard, the projected complexity of the case also bears directly on the court's ability to conserve resources. Here, the trial court did not inquire into the complexity or length of the parties' respective cases, which took only two days to try. Of overarching importance to the effective ad-

---

17. We have considered in a different context the need to accommodate a defendant's right to present a defense with the Fifth Amendment privilege of a proposed witness. *See Carter v. United States*, 684 A.2d 331, 336 (D.C.1996) (en banc). As we said in *Carter*, the Fifth Amendment privilege prevails such that the witness cannot be coerced to testify. *See id.* That does not, however, end the inquiry. What it means is that consideration *must be given to measures to harmonize two* important constitutional rights: the defendant's due process right to present a defense and the witness's privilege against self-incrimination. *See id.* at 343.

ministration of justice is safeguarding the defendant's due process rights. Just as justice delayed can be justice denied, a ruling that precludes the admission of substantially exculpatory evidence in the interest of efficiency loses sight of the primary goal of our justice system.

## C. *Conclusion*

██ We conclude that the trial court did not properly consider all of the *Jackson* factors. It gave too little, if any, consideration to Smalls's fundamental due process right to call an exculpatory witness. *See Martin,* 606 A.2d at 127 (stating that "the fundamental character of that right is a major factor to be considered in the balancing process") (citing *King,* 550 A.2d at 353). Smalls's need for Williams's exculpatory testimony to raise doubt about the government's case was manifest when the judge ruled pretrial.[18] The "settled rule" in our constructive possession jurisprudence is that simple proximity to contraband generally does not alone support an inference beyond a reasonable doubt that the accused had the requisite intent to exercise dominion and control over it, particularly where others are in similar proximity. *Rivas,* 783 A.2d at 130 (quoting *United States v. Staten,* 189 U.S.App. D.C. 100, 106, 581 F.2d 878, 884 (1978)). In this case, therefore, the pivotal evidence against Smalls was the testimony of the officers who observed him as he dipped his left shoulder below the crest of the car's front seat after the patrol car's emergency lights had been activated. The inference the government urged be drawn from this testimony was that Smalls was trying to conceal the handgun located on the transmission hub to the left of where he was sitting. There was no other evidence providing the necessary "link" between Smalls and the gun. *See id.* at 137. This circumstantial evidence of Smalls's knowledge of the weapon and intent to exercise dominion over it would have been directly contradicted by Williams's testimony that he did not see Smalls with a gun when he leaned forward nor at any other time. Because of the relative positions of the car's occupants, Williams was the only witness, other than Smalls himself, who could directly rebut the government's evidence. Although Williams surely would be impeached with his conditioned agreement to testify, that impeachment would have been countered by the fact that, in exculpating Smalls, Williams inculpated himself as the driver of the car. The jury, in other words, could well have been persuaded to credit Williams enough to create reasonable doubt about Smalls's guilt. *See King,* 550 A.2d at 357; *Sterling,* 691 A.2d at 131–32 (stating that questions of credibility are the province of the jury).

In denying the motion, however, the trial court did not give due weight to the importance of Williams's testimony to Smalls's defense; rather the court relied exclusively on the needs of efficiency in judicial administration. Moreover, in doing so, the trial court overemphasized a single outcome—the co-defendant's acquittal—as a necessary precondition to obtaining the co-defendant's testimony, without taking into account the actual costs of that course of action, or considering other possible outcomes and procedural avenues to ameliorate delay. Had the trial court done so, it would have realized that the concern for judicial efficiency was not weighty, as the government's case was uncomplicated and rested on the testimony of two police officers—the joint trial took only two days. If the defendants had been severed, and

---

18. When considering the severance motion pre-trial, the trial court had separate bench conferences with defense counsel and the prosecutor about the relevance of Williams's proffered testimony to the government's theory of joint constructive possession.

Williams had been acquitted after his trial, Smalls's trial could have commenced immediately. If, however, Williams were convicted (as he eventually was), his appeal could have been accompanied by a request for expedition. *See* D.C.App. R. 33(a). Even assuming *arguendo* that Smalls's separate trial would have been delayed awaiting the outcome of Williams's appeal and the police officers who testified in Williams's trial were not available for Smalls's trial, their sworn, cross-examined testimony from the previous trial could be introduced by the government at his trial. As noted, in opposing the motion to sever, the government did not assert that delay would prejudice its ability to present material evidence.

 Although we defer to the trial court's informed exercise of discretion, the trial court's decision in this case rested on a foundation rendered legally infirm by the omission of relevant factors, and therefore cannot be sustained. *See Johnson*, 398 A.2d at 365; *Martin*, 606 A.2d at 132 (citing *In re J.D.C.*, 594 A.2d 70, 75 (D.C. 1991)). Ordinarily, if we determine that the trial court did not fully consider all relevant factors, a remand for further consideration of the severance motion by the trial judge "under the proper standard" would be in order. *Newman v. United States*, 705 A.2d 246, 259 (D.C.1997) (citing *Wright v. United States*, 508 A.2d 915, 919–20 (D.C.1986) (other citations omitted)). We do not do so in this case, howev-

er, because on this record the trial court had "but one option," *id.*, to grant the severance motion. Given the essential and substantially exculpatory nature and effect of Williams's proffered testimony, Smalls's evident persistence in asserting his desire to present his co-defendant's testimony, the reasonable probability that the co-defendant would testify once his Fifth Amendment privilege had been extinguished, and, most especially, the importance of Smalls's fundamental due process right to present this testimony in his defense, any remaining concerns about judicial efficiency could not as a matter of law justify denial of the motion for severance. *See Martin*, 606 A.2d at 132 (in reversing conviction and remanding for a new trial, court noted that trial judge did not consider defendant's right to present a defense, the proffered testimony was exculpatory, defendant vigorously attempted to present co-defendant's testimony, co-defendant's Fifth Amendment privilege had been extinguished by mid trial plea, and—in the context of a two-week trial—the demands of judicial administration would have been better served if a separate trial had been granted at the time rather than following appeal). Under these circumstances, denial of Smalls's request for severance denied him a fair trial and due process of law, "which was his constitutional due." *Id.* As there would be no purpose to a remand to reconsider the severance motion because the trial court could follow only one course, we reverse and remand for a new trial.[19]

---

19. Events subsequent to the trial judge's pretrial ruling only confirm our assessment. The importance of Williams's testimony previewed during bench conferences on the request for severance pre-trial, see note 18, *supra,* has been confirmed by the evidence actually presented at trial. The Williams affidavit presented post-trial further strengthened the *proffer* made by counsel before the trial. And by affirming Williams's convictions on appeal, see *infra,* the sole condition on Smalls's prof-

fer of his co-defendant's testimony, his Fifth Amendment privilege, has been satisfied. If Williams, notwithstanding his affidavit, were now unwilling to testify, given our affirmance of his conviction, he could be called to the witness stand in Smalls's new trial and, if necessary, compelled to testify under pain of perjury. His sworn affidavit could be used to impeach contrary testimony and, most likely, be admitted as substantive evidence under the hearsay exception for statements against pe-

## III.

We need not dwell on Williams's contention that the government failed to introduce evidence of constructive possession sufficient to prove his guilt beyond a reasonable doubt. As noted, to establish constructive possession, the government had to prove beyond a reasonable doubt that Williams (1) knew of the handgun's presence and had both (2) the ability and (3) the intent to exercise dominion and control over it. *See Rivas*, 783 A.2d at 129. Williams specifically claims that the government's evidence failed to establish "elements one and three of constructive possession," and, therefore, he could not have been found "guilty of any of the three offenses." We disagree.

Williams was the owner of the vehicle and was driving it on the night of the traffic stop. In the course of that stop, Williams repeatedly disobeyed Officer Spalding's order by removing his right hand from the steering wheel. He twice attempted to move his hand directly toward the handgun, and once batted forward a bag of chips resting on the front seat, with the apparent purpose in each instance to conceal or cover the butt of the gun which could be seen protruding from underneath the front seat. Taken in the light most favorable to the government, the evidence of Williams's gestures provided more than a sufficient basis upon which a reasonable juror could infer beyond a reasonable doubt that Williams both knew of the gun and intended to conceal it. *See Rivas*, 783 A.2d at 137 (stating that "[w]hen the government proves the presence of contraband in an automobile, in plain view, conveniently accessible to a passenger defendant, the additional evidence necessary to prove constructive possession is comparatively minimal" and may include, *inter alia*, "a furtive gesture indicating an attempt to access, hide or dispose of the object"); *(Mischell) White v. United States*, 714 A.2d 115, 119 (D.C. 1998) (explaining that where the appellant was seen reaching into a potato chip box from which a gun was later recovered, the jury "could reasonably infer that [the appellant] was trying to hide the gun from the police, and that therefore he had knowledge of its presence and both the intent and the ability to guide its destiny"); *Wheeler v. United States*, 494 A.2d 170, 173 (D.C.1985) ("Other circumstances that will buttress the 'constructive possession' inference include attempts to hide or destroy evidence.") (citations omitted); *see also (Larry) White v. United States*, 763 A.2d 715, 725 (D.C.2000) (reasoning that "the location of the weapon in plain view [is] sufficient to permit the jury to infer that the appellant knew of its presence") (alteration in original) (quoting *Brown v. United States*, 546 A.2d 390, 398 (D.C. 1988) (citation omitted)); *Taylor v. United States*, 662 A.2d 1368, 1373 (D.C.1995) ("It is usually easy to establish that the owner of a car . . . has constructive possession of illicit items recovered from [the car]."). Moreover, because the handgun sat in the middle of the car on top of the transmission hub, and thus close to the underside of the front seat, the jury could readily infer that Williams had the ability to exercise dominion and control over the gun. *See (Larry) White*, 763 A.2d at 725 (reasoning that "evidence of proximity [is] suf-

---

nal interest. *See Akins v. United States*, 679 A.2d 1017, 1033–34 (D.C.1996). And if the police officers who testified in the joint trial were no longer available for Smalls's separate new trial, their sworn cross-examined testimony from the previous joint trial could be introduced by the government. *See Harris v. United States*, 614 A.2d 1277, 1284 (D.C. 1992) (citing, *inter alia*, Federal Rule Evidence 804(b)(1), *overruled on other grounds by Carter*, 684 A.2d at 334).

ficient to permit the jury to infer convenient access") (alteration in original) (quoting *Brown*, 546 A.2d at 398); *(Mischell) White*, 714 A.2d at 119 (explaining that to sustain a CPWL conviction, "the government's evidence must go beyond mere proof of constructive possession and must show that the pistol was in such proximity to the person as to be convenient of access and within reach") (internal quotation omitted; citations omitted). The evidence was therefore sufficient to convict Williams of the weapons offenses.

### IV.

For the foregoing reasons, Smalls's conviction is reversed and the case remanded for a new trial. The judgment of conviction against Williams stands affirmed.

*So ordered.*

STEADMAN, Senior Judge, concurring in part and dissenting in part.

I join in part III and agree with the majority's analysis in part II of the factors to be taken into account in the decision whether to sever in this case and the conclusion that the trial court failed to fully consider all relevant factors, thereby itself constituting an abuse of discretion. However, in this case I would not at this point make a determination that the trial court had but "one option" but rather would follow our normal course and remand to allow the trial court to consider the issue with the guidance of the majority opinion. A trial court has broad discretion in this area and "[a]n order denying severance may be reversed only upon a clear showing of abuse of discretion." *Dancy v. United States*, 745 A.2d 259, 266 (D.C.2000). Where a trial court in exercising its discretion has failed to consider fully all factors, I am inclined to think the more appropriate course will normally be to let the trial court properly address the discretionary

issue in the first instance and to benefit from its on-the-scene analysis, at least where the "one option" is not clear on its face as I believe not to be the case here. *Cf. Robinson v. United States*, 878 A.2d 1273, 1291 (D.C.2005) (concurring/dissenting opinion of Steadman, J.). If the trial court rules in favor of a new trial for Smalls, that of course will be the end of the matter.